## S10A1719. FOX v. THE STATE.
### (709 SE2d 202)

NAHMIAS, Justice.

Michael Fox was convicted by a Gwinnett County jury of malice murder, felony murder, and armed robbery stemming from the shooting death of Jerry Ann Elliott.[1] On appeal, Fox contends, among other things, that the evidence is insufficient to support his convictions. We conclude that the evidence is sufficient to support his conviction for malice murder but insufficient to support his armed robbery conviction. We see no merit in Fox's other contentions, and we therefore affirm in part and reverse in part.

1. Viewed in the light most favorable to the verdict, the evidence at trial showed that the victim and her husband, James Elliott, sold pine straw for a living, required cash payments from most customers, and usually kept $6,000 to $15,000 in cash in a kitchen drawer at their home. Fox knew about the pine straw business and how the money was handled, and Mr. Elliott had seen Fox with a 9mm handgun.

On September 27, 2007, the day before the shooting, Mr. Elliott went to check on some property he owned in Toccoa and stayed the night there. He returned home about 5:00 p.m. on September 28. When he pulled into his garage, he noticed that a utility closet door had been "busted open," and when he entered his house, he found his wife dead on the den floor, which adjoins the kitchen. The money for the pine straw business was missing from the kitchen drawer, as was Ms. Elliott's wallet and a cup containing gold dollar coins. Ms. Elliott died from three gunshot wounds to the head, all fired from the same 9mm handgun.

Carlos Lopez testified that he drove by the Elliotts' house every day on his way to work. On the day of the shooting, he drove by the house about 9:20 a.m. and noticed a pickup truck in the driveway. He

---

[1] The crimes occurred on September 28, 2007. On October 17, 2007, Fox was indicted for malice murder, felony murder, armed robbery, and possession of a firearm by a convicted felon. At a bifurcated trial, the jury found Fox guilty of malice murder, felony murder, and armed robbery on July 21, 2009. The State then agreed to enter a nolle prosequi on the firearm offense. On July 28, the trial court sentenced Fox to consecutive life sentences on the malice murder and armed robbery convictions. The felony murder conviction was vacated as a matter of law. Fox filed a timely motion for new trial, which the trial court denied on February 25, 2010. On March 15, 2010, Fox filed a notice of appeal. The case was docketed to the September 2010 term of this Court and submitted for decision on the briefs.

had never before seen that vehicle, which he described as an unusual looking Japanese truck that had "a lot of different colors . . . [and] no front bumper." This description matched an Isuzu pickup truck owned by Fox's girlfriend, Angie Johnson. Lopez later identified Johnson's truck for the police.

Angie Johnson testified that, although Fox had lost his leg in a motorcycle accident in 2003, he could drive her truck and had no problem moving around on crutches. The day before the shooting, she saw Fox with a 9mm handgun.

On the day of the shooting, when she woke up, her truck and Fox were gone. Fox returned around 11:00 a.m, and when she asked him where he had been, he showed her a jar with change in it and asked her how much money she thought was in it. There was also a duffel bag in the floorboard of the truck. Fox asked her to take the jar and hide it in their house. Fox then told her that they had to go somewhere. They drove to a beer store, where Fox got out of the truck and told Johnson not to "look in that bag or I'll have to kill you." However, after Fox went into the store, Johnson unzipped the bag, opened it, saw Ms. Elliott's wallet, and then zipped the bag closed. After Fox returned, they drove to a subdivision under construction. There, Fox told Johnson to get out of the truck, as he had to get rid of something. Johnson got out and waited while Fox left for three or four minutes. Johnson's truck did not have insurance, and Fox told her they would go and get some. They drove to an insurance agency where Fox gave Johnson $250 in cash to purchase the insurance. After they returned to their home, they were watching the evening news, which broadcast a story about Ms. Elliott's murder. According to Johnson, Fox had a shocked look on his face and said he did not want to talk with anyone.

The next morning, the police came to their trailer and spoke with her. She lied, telling them that Fox had borrowed her truck for only five to ten minutes the day before to buy her some cigarettes. Fox later asked Johnson what she had told the police, and when she told him, he said "why did you do that, I told them I didn't go anywhere." For the next five or six days, Fox was scared and would not let Johnson out of his sight, often locking her in the house when he left. Johnson became scared and left Fox to live with her sister on October 8, 2007. She called the police the next day, told them what had happened, and took them to the subdivision where Fox had driven on the day of the crime. The police found the victim's wallet in a sewer drain at the subdivision.

(a) Viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient for a rational jury to find Fox guilty beyond a reasonable doubt of malice murder. See *Jackson v. Virginia,* 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560)

(1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)).

(b) We reach a different conclusion with regard to the armed robbery conviction. The indictment charged that Fox committed armed robbery in violation of OCGA § 16-8-41 (a) by taking United States currency and the victim's wallet by "use of an offensive weapon," a handgun.[2] The State therefore was required to prove beyond a reasonable doubt that Fox's use of the handgun occurred "prior to or contemporaneously with the taking." Robert E. Cleary, Jr., Kurtz Criminal Offenses and Defenses in Georgia, Robbery, p. 1464 (2009 ed.) (Kurtz) (citing *Miles v. State*, 261 Ga. 232, 234-235 (403 SE2d 794) (1991); *Hicks v. State*, 232 Ga. 393, 402-403 (207 SE2d 30) (1974), and several Court of Appeals cases). We have also held, in this context, that the "taking" of property is not a continuing transaction which ends only when the defendant leaves the presence of the victim. See *Hicks*, 232 Ga. at 402-403. Instead, the taking is complete once control of the property is transferred involuntarily from the victim to the defendant, even if only briefly. See *James v. State*, 232 Ga. 834, 835 (209 SE2d 176) (1974); Kurtz at 1455-1456.

In *Hicks*, the defendant entered the victim's house while she was asleep. He first took her billfold and then awakened her at gunpoint to demand more money. When he did not receive any, he left. See 232 Ga. at 402. The State contended that "the taking [of the billfold] was (a) continuing transaction that ended only when appellant left the house" and that the evidence was therefore sufficient to support Hicks's armed robbery conviction. This Court found "it impossible to reconcile the theory of a 'continuing transaction' with previous decisions of this court which have held that force used in an attempt to escape with property taken by larceny does not transform the crime into robbery." Id. at 403 (citations omitted). We held that the armed robbery statute "clearly contemplates that the offensive weapon be used as a concomitant to a taking which involves the use of actual force or intimidation (constructive force) against another person." Id. Concluding that "the taking in this case occurred when the billfold was removed from the pocketbook by appellant while the victim was still asleep, and not thereafter," we reversed the conviction. Id.

---

[2] OCGA § 16-8-41 (a) provides that "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon."

*Hicks* was followed in *Miles v. State*, which also applied the principle that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6. In *Miles*, the victim was found strangled to death on the floor of her bedroom, and a brass horse had been stolen from her house. See 261 Ga. at 233-234. At trial, Miles testified that she stole the brass horse but did not kill the victim. She maintained that, after she took the brass horse from the living room, she walked to the back of the house, saw the victim asleep in her bedroom, and then left the house. See id.

After citing *Hicks*, the Court held as follows:

> In the instant case, the evidence fails to establish whether Miles first took the brass horse and then killed the victim and ransacked the house, or whether Miles first killed the victim and then took the brass horse and ransacked the house. Under the first hypothesis, Miles would not be guilty of armed robbery. Under the second hypothesis, Miles would be guilty of armed robbery.
>
> As both hypotheses are equally reasonable, we must conclude that the evidence is insufficient to meet the standard of § 24-4-6 and, moreover, is insufficient for a rational trier of fact to have found Miles guilty of armed robbery beyond a reasonable doubt.

*Miles*, 261 Ga. at 235 (citations omitted).

In this case, as in *Miles*, the evidence supports two equally reasonable hypotheses. One is that Fox surreptitiously entered the Elliotts' house, took possession of the cash, coins, and wallet in the kitchen, and only then was confronted by the victim, who was found dead in a room adjoining the kitchen, as she approached from the back of the house. The other hypothesis is that, when Fox entered the house, he confronted and killed the victim before he took the items. There is no direct evidence regarding where the victim was when Fox entered the kitchen. Nor is there evidence, like signs of forced entry, from which the jury might have reasonably inferred that the victim heard and confronted Fox before he could take anything, or that she usually kept her wallet on her person or in her bedroom, which might support an inference that Fox had to confront her before taking the wallet. Accordingly, the evidence is insufficient to support Fox's armed robbery conviction, which must therefore be reversed. See *Miles*, 261 Ga. at 234-235; *Hicks*, 232 Ga. at 402-403.

2. Angie Johnson testified that, in the days following the shooting, Fox began to act erratically and she decided to leave him.

She added, unsolicited, that one night Fox told her that he "was tired of living" and that he was going to shoot her and then shoot himself. Fox objected and moved for a mistrial, which the trial court denied.[3] Fox now contends that the denial was an abuse of discretion.

" 'Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial.' " *Childs v. State*, 287 Ga. 488, 492-493 (696 SE2d 670) (2010) (citation omitted). The trial court here carefully considered Fox's motion, offered to give a curative instruction, which Fox declined, and determined that the testimony was not harmful enough to warrant a mistrial. We conclude that the trial court did not abuse its broad discretion in denying the mistrial motion. See id.

3. After Johnson testified that Fox threatened her, Fox claimed (out of the jury's presence) that in 2004 she had made an allegation against him that resulted in his indictment for making a terroristic threat, but she later came to court and testified that she had lied to the police. Fox asked the court to permit him to impeach Johnson with this 2004 incident. The State countered that, if the court allowed Fox to cross-examine Johnson about that incident, the State should be allowed to have her explain the reasons for her recantation, including the role that other incidents of domestic violence by Fox against her might have played. The trial court agreed with the State, which Fox now asserts was error. The State, however, "is permitted to rehabilitate a witness whose credibility had been attacked." *Nance v. State*, 272 Ga. 217, 222 (526 SE2d 560) (2000). Here, if Fox had questioned Johnson about her recantation of the 2004 allegation, other incidents of domestic violence by Fox against her would have been relevant to explain her recantation. Accordingly, the trial court did not abuse its discretion in making this evidentiary ruling. See id.

4. Fox's remaining two enumerations of error relate to his armed robbery conviction and sentence. Because we reverse that conviction, we need not address those claims.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED FEBRUARY 28, 2011 —
RECONSIDERATION DENIED APRIL 12, 2011.

*G. Richard Stepp*, for appellant.

---

[3] Fox's brief suggests that Johnson's testimony related to another incident between them that was the subject of a motion in limine, but it clearly did not.

*Daniel J. Porter, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Reggie A. Lampkin, Assistant Attorney General,* for appellee.