## S13A0884. PITCHFORD v. THE STATE.
(751 SE2d 785)

HUNSTEIN, Justice.

Appellant Shabuoy Pitchford was convicted of murder, burglary, armed robbery, and related offenses in connection with the September 2006 shooting death of Rickey Greene. Pitchford appeals the denial of his motion for new trial, contending certain evidence should have been suppressed, other evidence was improperly admitted, the evidence on the armed robbery count was insufficient, and the jury instructions were erroneous in certain respects. Finding no error, we affirm.[1]

Construed in the light most favorable to the jury's verdicts, the evidence adduced at trial established as follows. On September 2, 2006, Pitchford, then 17 years old, was playing basketball in front of the home of a neighbor, Rickey Greene. Pitchford had left a cell phone belonging to his mother nearby on the pavement, and when Greene pulled into his driveway, he accidentally ran over the phone. Pitchford, angry, yelled and cursed at Greene. In apology, Greene invited Pitchford into his home, and Greene conducted online research regarding a replacement phone on his Apple laptop computer. Greene then gave Pitchford a ride to his nearby home, where he spoke to Pitchford's mother about the phone, and then drove to the mall to look for a new phone. When Greene returned to his home, he discovered that one of his windows was broken, and his Apple laptop was missing from the desk near that window. He reported the burglary to police.

Eleven days later, on September 13, 2006, Greene was found dead in the living room of his home, with gunshots to the head and neck. He had last been seen alive two days prior, on September 11, and the autopsy confirmed that he had been shot within the preceding 24 to 48 hours, from a distance of two to three feet away. One of the shots had been fired through a pillow that had apparently been placed over the side of Greene's head, and forensic evidence indicated that Greene had been lying face down or kneeling on all fours at the

[1] Pitchford was named in ten of eleven counts in an indictment returned by a DeKalb County grand jury in October 2007 against him and co-indictee Ricky Oliver. Pitchford was charged with malice murder, three counts of felony murder, armed robbery, two counts of burglary, aggravated assault, and two counts of theft by receiving. At the conclusion of a jury trial held in September 2009, Pitchford was convicted on all counts except those for theft by receiving. On September 11, 2009, he was sentenced to a total of two consecutive life terms plus two consecutive twenty-year terms. Pitchford filed a motion for new trial on October 8, 2009, which was amended on April 17, 2012. The trial court denied the motion on June 27, 2012, and Pitchford filed a timely notice of appeal on July 20, 2012. The appeal was docketed to this Court's April 2013 term and thereafter was submitted for decision on the briefs.

time he was shot. At the scene, investigators discovered two .380 caliber bullet casings near the victim's body. The home's master bedroom had been ransacked. An empty Dell laptop case was recovered, and there were unconnected computer wires pulled out over a table in the living room. While there was no evidence of forced entry, a detective testified that the front door lock was easily capable of being "picked" with a credit card or other thin, hard plastic item. A latent fingerprint, later determined to be Pitchford's, was lifted from the front door jamb. Greene's car was also missing.

While investigators were processing the scene, Pitchford and his friend and co-defendant, Ricky Oliver, approached. Pitchford, bypassing patrol cars blocking the street, walked up to F.J. Renaud, a uniformed officer with the DeKalb County Police Department, to ask what had happened. Officer Renaud asked Pitchford his name and where he lived, and when Pitchford pointed to his home up the street, Renaud asked Pitchford whether he knew Greene. At that point, Officer Renaud testified, Pitchford's demeanor changed, and Pitchford told him that he and Greene had recently "had some words" in connection with an incident with a cell phone. His suspicions aroused, Officer Renaud told Pitchford he needed to move away from the scene and then notified detectives of his conversation with Pitchford. Pitchford walked back up the street to rejoin Oliver.

After speaking with a detective, Officer Renaud, accompanied by another patrol officer, approached the two friends, and Oliver asked whether someone had been shot. Officer Renaud asked Oliver for his name and address, and then relayed this information to another detective, who noted that Oliver was a suspect in the earlier burglary at Greene's home. Officer Renaud again approached and began asking Oliver about recent burglaries in the area, at which point Oliver became visibly nervous and volunteered that he was in possession of a laptop stolen from Greene's home, but that he had not stolen it. Officer Renaud continued questioning Oliver until Detective Charles Franklin, the lead detective on the September 2 burglary, approached and directed that Pitchford and Oliver be arrested in connection with that crime.

In a post-arrest interrogation, Pitchford admitted that he was in possession of the missing Dell laptop. A subsequent search of Pitchford's home turned up the Dell laptop, as well as a watch and a gold ring, both later determined to have belonged to Greene. Also seized from Pitchford's home were a pair of latex gloves, a brown stocking mask, and a box containing writings riddled with expletives and references to guns, killing, and violence. Police also searched Oliver's home, where they found Greene's Apple laptop.

A later search of the home of two of Pitchford and Oliver's friends, Michael Martin and Keelyn Lockhart, turned up a .380 caliber handgun, a camcorder, a digital camera, and three videocassettes with Greene's name on them. On one of the videocassettes was footage of Pitchford, Martin, and Lockhart, as well as news coverage of Greene's murder. Expert testimony established that the fatal bullets had been fired from the .380 handgun. Martin testified that, on September 12, Pitchford had come to their house, given Lockhart the camcorder as a birthday present, and phoned an associate named "Mo" to try to sell him a gun.

Witness Archie Watkins, a close friend of Greene, testified that Greene had told him about the September 2 burglary. According to Watkins, after the burglary, Greene approached Pitchford about his missing laptop; Pitchford indicated that he might know who had it; and Greene told Pitchford to make it known that he was willing to pay $400 to buy it back. Pitchford's goddaughter likewise testified that, the weekend before he was murdered, Greene told her that he believed one of Pitchford's friends had his laptop and that he was in the process of arranging to get it back on the following Tuesday, September 12.

Oliver made a series of post-arrest statements, which evolved from a denial of any knowledge of or involvement in the crimes, to an admission that he had acted as a lookout for Pitchford during the second burglary. In his final statement, Oliver told police he stood outside Greene's home on the evening of September 11 for approximately ten minutes while Pitchford went inside; that he heard "loud sounds like drawers being pulled out" and then "two muffled shots"; and that two to three minutes later Pitchford emerged from the home with a gun in one hand and what looked like a laptop under his other arm, and ran away. At trial, Oliver testified that this statement had been coerced and denied any involvement beyond receiving the Apple laptop from Pitchford.

The State also presented evidence that Pitchford had previously admitted to burglarizing a neighbor's home by entering through an unlocked window and stealing a video game console, DVD player, and related items.

1. The evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Pitchford was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Pitchford specifically challenges the sufficiency of the evidence only as to the armed robbery count, and we therefore undertake a more detailed discussion of the evidence as to that crime. The crime of armed robbery is committed when a person "with intent to commit theft . . .

takes property of another from the person or the immediate presence of another by use of an offensive weapon." OCGA § 16-8-41 (a). The indictment here alleged that Pitchford took from Greene's immediate presence, by use of a handgun, various items including a laptop computer and a camcorder.

Pitchford first contends that there was insufficient evidence that these items were in Greene's immediate presence at the time he was shot or that Pitchford himself actually took any of these items. Contrary to this contention, there is ample evidence that Pitchford took a laptop during the September 11 burglary, including Oliver's statement that he saw Pitchford emerge from Greene's home with a laptop under his arm; the fact that the Dell laptop was recovered in the search of Pitchford's home; and the unconnected computer cords hanging from the table in the living room where Greene's body was found. As to the camcorder, Martin and Lockhart both testified that Pitchford appeared the day after the murder with the camcorder, which the three proceeded to use to videotape themselves on video-cassettes belonging to Greene. Given that Greene, in reporting the September 2 burglary to police, mentioned only his Apple laptop, it was reasonable for the jury to assume that the Dell laptop and camcorder were taken during the second burglary and murder.

Pitchford also asserts that, lacking any eyewitness accounts from inside Greene's home, the State failed to prove that the gun was used prior to or contemporaneously with any taking of property that may have occurred. See *Fox v. State*, 289 Ga. 34 (1) (b) (709 SE2d 202) (2011) (in order to sustain armed robbery conviction, evidence must show that weapon was used " 'as a concomitant to a taking [involving] the use of actual force or intimidation . . . against another person' "). We disagree. The evidence that Greene was shot in the living room, where his body was found, together with the evidence that the Dell laptop had been disconnected from its wires in that same room, strongly suggests that Pitchford used the gun prior to or contemporaneously with his taking of Greene's property. Compare id. at 37 (reversing armed robbery conviction where evidence supported two reasonably equal hypotheses, one being that defendant entered victim's home surreptitiously, took possession of victim's money, and only then encountered and shot victim).

2. Pitchford contends that the evidence seized in the search of his home should have been suppressed. He asserts that police lacked probable cause when they arrested him; that his *Miranda*[2] rights

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

were violated when he was interrogated after his arrest; and therefore that the search of his home, spawned by his post-arrest statements, was improper and its fruits should have been suppressed. We disagree.

As demonstrated by the evidence adduced at the pretrial suppression hearing, Pitchford brought himself to the attention of police by voluntarily approaching the scene of the murder and inquiring about what had happened. In response to Officer Renaud's question as to whether Pitchford knew the victim, Pitchford mentioned that he had recently had a "run-in" with Greene over a cell phone and that he was "still angry" about it because the phone had not been replaced. Pitchford also confirmed that Oliver, who was observing the scene from up the street, was "his boy," i.e., his friend. After Pitchford walked away to rejoin Oliver, Officer Renaud and another officer approached the pair, and Oliver immediately asked whether someone had been shot, which raised the officers' suspicions because details of the crime were as yet unknown even to the officers. During the conversation that followed, Oliver told Officer Renaud that he was in possession of a laptop belonging to Greene and that Pitchford had stolen it. At that point, Officer Renaud stepped away to speak with detectives at the scene, who verified that a previous burglary had been reported at Greene's home; that two people were suspected of committing that burglary; and that Oliver was under suspicion as one of the two perpetrators. Officer Renaud then detained the two for further questioning by detectives, who ultimately ordered them arrested in connection with the September 2 burglary.

Contrary to Pitchford's contention, the police had sufficient probable cause to arrest both Oliver and Pitchford in connection with the September 2 burglary. Probable cause for a warrantless arrest exists if

> at the moment the arrest is made, the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed or was committing an offense.

*Durden v. State,* 250 Ga. 325, 326 (1) (297 SE2d 237) (1982). Accord *State v. Tyson,* 273 Ga. 690 (3) (544 SE2d 444) (2001). Here, there was ample evidence to support a reasonable belief by the arresting officers that both Pitchford and Oliver had participated in the burglary of Greene's home: the pair were clearly associates; Oliver was already suspected in the burglary and admitted to possessing the stolen laptop; Oliver stated that Pitchford had actually stolen it; Pitchford

admitted to having been angry with the victim, providing a possible motive for the burglary; and both boys were loitering around the scene of the burglary and now murder, expressing unusual interest in and potential knowledge about the murder. Their arrests were thus properly supported by probable cause. See *Tyson*, 273 Ga. at 693-694 (3); *Durden*, 250 Ga. at 326 (1).

As to Pitchford's post-arrest statements, the interrogating officer testified at the pretrial suppression hearing that, when he initially questioned Pitchford, he was unaware that Pitchford was under arrest for the September 2 burglary and believed he was merely being questioned as a person of interest in the murder. He therefore did not read Pitchford his *Miranda* rights at the outset. Pitchford made various incriminating statements during this first phase of questioning, which the trial court properly suppressed as having violated *Miranda*. Once Pitchford was *Mirandized*, he requested an attorney, and the officer asked no further questions regarding the crimes. The officer, having observed Pitchford's tattoos, did ask Pitchford if he was a member of a particular gang, at which point Pitchford, in the officer's words, "jumped back into talking about a laptop that was taken from the deceased's residence," which Pitchford claimed to have received from Oliver on the night of the murder. With this information, officers obtained a search warrant for Pitchford's home, which led to the seizure of the Dell laptop and other incriminating items found there.

The trial court declined to suppress Pitchford's statement regarding the stolen laptop, finding that it was not a response to custodial questioning but rather a spontaneous statement. See *Velazquez v. State*, 282 Ga. 871 (8) (655 SE2d 806) (2008) (voluntary and spontaneous statement not prompted by custodial interrogation is admissible). Pitchford disagrees with the trial court's finding, asserting that the statement was prompted by the officer's continued questioning, in violation of his right to counsel under *Edwards v. Arizona*, 451 U. S. 477, 484-485 (101 SCt 1880, 68 LE2d 378) (1981) (once accused invokes right to have counsel present during custodial interrogation, police cannot induce waiver of right to counsel by further interrogation). However, we need not decide whether the statement itself was admissible in order to assess the validity of the search of Pitchford's home. We have held unequivocally that "the 'fruit' of a voluntary statement obtained in violation of *Edwards v. Arizona* is not subject to the exclusionary rule." *Taylor v. State*, 274 Ga. 269, 276 (4) (553 SE2d 598) (2001). Accord *State v. Woods*, 280 Ga. 758, 759 (632 SE2d 654) (2006). Only if the statement was made involuntarily would the "fruits" thereof be subject to suppression. Id. (voluntariness of statements made in violation of *Edwards* was "dispositive issue" in

determining whether fruits of statements were admissible); *Taylor*, 274 Ga. at 276 (4) (gun discovered as result of statement obtained in violation of *Edwards* was admissible because statement was voluntary). Here, there is no evidence or allegation that Pitchford's statement about the Dell laptop was "induced by another by the slightest hope of benefit or remotest fear of injury," so as to render it involuntary. See former OCGA § 24-3-50.[3] Therefore, even if we were to find that Pitchford's statement about the laptop was obtained in violation of *Edwards*, the evidence yielded from the subsequent search based on this statement was properly admitted.

Finally, Pitchford challenges the seizure of the violent and expletive-laden writings found in his bedroom in the course of the police search, on the ground that they exceeded the scope of the warrant. Specifically, Pitchford contends that because the warrant sought only computer equipment, weapons, blood-stained clothing, and other items constituting "fruits . . . [or] instrumentalities linked to the crime[s] of murder . . . and burglary," the warrant did not authorize the seizure of his writings. We disagree. The writings were filled with references to killing and guns and thus could be properly considered an "instrumentalit[y] linked to the crime of murder" sufficiently within the scope of the warrant.

3. Pitchford next claims that the trial court erroneously allowed the State to present several items of highly prejudicial evidence, including the writings found in Pitchford's bedroom, the videotape of Pitchford, Martin, and Lockhart, and testimony regarding the prior burglary committed by Pitchford.

(a) With regard to the writings, we have previously held that writings alluding to violent behavior and killing, and thus arguably indicative of a defendant's proclivities to violence, may be admissible so long as their prejudicial effect does not outweigh their probative value. See *Castillo v. State*, 281 Ga. 579 (7) (a) (642 SE2d 8) (2007). In this case, the writings were unquestionably inflammatory and, in our view, contributed little of probative value. However, these writings represented a small fraction of the evidence presented over the course of the week-long trial. Therefore, even assuming arguendo the trial court erred in admitting them, such error was harmless given the strength of the other evidence against Pitchford, including Oliver's statements identifying Pitchford as the perpetrator of all the crimes; Pitchford's possession of items belonging to Greene; Pitchford's fingerprint recovered from the door jamb of Greene's home; his prior

---

[3] Under the new Georgia Evidence Code, applicable to trials conducted on or after January 1, 2013, this provision is now codified at OCGA § 24-8-824.

dealings with Greene, establishing a potential motive for the crimes or at least an opportunity to "case" Greene's home for items of value; and the testimony of Martin and Lockhart and items belonging to Greene recovered from their home. See *Billings v. State*, 293 Ga. 99 (3) (745 SE2d 583) (2013) (overwhelming evidence of guilt dispensed with need to assess whether admission of particular item of evidence was error).

(b) Next, Pitchford contends that the trial court erred in admitting and playing for the jury the video recordings seized along with Greene's camcorder and other items found in the search of Martin and Lockhart's home. Though prejudicial because it depicted Pitchford smoking marijuana, making crude jokes, and reciting inflammatory rap lyrics, the recording was relevant in that other content on the seized tapes proved that the tapes themselves, along with the camcorder on which they were made, had belonged to Greene. The recordings themselves thus established a definitive link between Pitchford and property stolen from Greene, and this evidence was, therefore, properly admitted. See *Sifuentes v. State*, 293 Ga. 441 (3) (746 SE2d 127) (2013) (no abuse of discretion in admitting video recordings that, though inflammatory, were relevant).

(c) Pitchford next claims that the trial court erred in admitting evidence regarding the prior burglary he admitted to committing. Specifically, the State offered the testimony of the arresting officer, who testified that Pitchford, who was 15 years old at the time, admitted upon arrest that he had entered the unlocked window of a neighbor's home and stolen a video game console, video games, and other electronics.

> Before evidence of independent acts may be admitted into evidence, the State must show that it seeks to introduce the evidence for an appropriate purpose; that there is sufficient evidence to establish that the accused committed the independent act; and that there is a sufficient connection or similarity between the independent act and the crime charged so that proof of the former tends to prove the latter.

(Citations omitted.) *Abdullah v. State*, 284 Ga. 399, 401 (3) (667 SE2d 584) (2008). We review the trial court's decision to allow similar transaction evidence for abuse of discretion. *Moore v. State*, 293 Ga. 676 (1) (748 SE2d 419) (2013).

Here, all the requisites of admissibility were satisfied. First, the trial court admitted the evidence for the limited purpose of proving Pitchford's intent and bent of mind, which was a proper purpose for admitting such evidence at the time of the trial. See *Barnes v. State*,

287 Ga. 423 (3) (696 SE2d 629) (2010).[4] The jury was properly instructed on this limited purpose for which the evidence was to be considered. Second, Pitchford himself admitted committing the burglary, so this factor was not in question. Finally, the earlier burglary bore numerous similarities to the September 2 burglary, in that they both involved unauthorized entry into the home of a neighbor, through the window, with the purpose of stealing electronics. The trial court therefore did not abuse its discretion in admitting this evidence. Id. at 426 (3).

4. Pitchford also contends that the trial court erred in permitting witness Watkins to testify regarding Greene's statements regarding the offer he made to Pitchford to buy back his Apple laptop for $400. This testimony was admitted under the necessity exception to the rule against hearsay, "which requires the proponent to establish 'a necessity for the evidence, a circumstantial guaranty of the statement[s'] trustworthiness, and that the hearsay statements are more probative and revealing than other available evidence.'" (Citation omitted.) *Faircloth v. State*, 293 Ga. 134, 137 (3) (744 SE2d 52) (2013). Here, "[g]iven that the victim is deceased and thus [was] unavailable to testify, it is undisputed that the first prong of the necessity exception has been satisfied." Id. In addition, Watkins testified that he and Greene had known each other for more than ten years and were "best friends," thereby satisfying the "trustworthiness" element of the necessity exception. See *Mathis v. State*, 291 Ga. 268, 271 (3) (728 SE2d 661) (2012) ("a statement is trustworthy when made to someone with whom the declarant enjoys a close personal relationship"). Finally, given that there is no indication that anyone other than Pitchford himself was present when Greene spoke with Pitchford about paying for the return of his laptop, there was no other available evidence indicating that Greene had any awareness of Pitchford's possible knowledge about or complicity in the September 2 burglary. There was no error in admitting this testimony.

5. Pitchford next contends that the trial court committed "plain error" in erroneously instructing the jury that "[i]t is not for the jury to decide whether or not the facts and circumstances of this case show malice." Compare Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2013), § 2.10.10. The State does not dispute that the word "not" was mistakenly inserted into this charge and that the jurors were thus incorrectly instructed that they were *not* to decide whether the facts and circumstances of the crime showed malice. No objection

---

[4] We note that the rules for admissibility of independent crimes or acts have since changed, with the enactment of the new Georgia Evidence Code. See OCGA § 24-4-404 (b).

was raised to this instruction at any time during trial, which means that this Court is limited to a "plain error" review of the erroneous charge. See *State v. Kelly*, 290 Ga. 29 (1) (718 SE2d 232) (2011) (under OCGA § 17-8-58, error in jury charge to which no objection was raised at trial is reviewable only under "plain error" standard). Plain error requiring reversal will be found only where "the instruction was erroneous, the error was obvious, the instruction likely affected the outcome of the proceedings, and the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Smith v. State*, 292 Ga. 316, 319 (3) (737 SE2d 677) (2013).

Here, while the inadvertent insertion of the word "not" into the instruction on malice was undeniably erroneous, and while the error is obvious from our standpoint on review of the written trial transcript, we do not believe the instruction likely affected the outcome of the trial or the fairness of the proceedings. To the contrary, we believe that this error resulted from an inadvertent slip of the tongue on the part of the trial judge and most likely went unnoticed by those present; had it not, both defendants' attorneys would likely have immediately objected. Moreover, while this particular sentence of the charge was inaccurate, the court otherwise correctly defined the crime of malice murder; correctly defined the concept of legal malice; and correctly instructed the jury that intent is an essential element of each crime charged and must be proven by the State beyond a reasonable doubt. See *Williams v. State*, 267 Ga. 771 (2) (a) (482 SE2d 288) (1997) (single slip of the tongue not reversible error where charge in its entirety conveyed legal concept accurately). Viewing the jury charge in its entirety, we conclude that the error did not constitute plain error so as to require reversal. See *Alatise v. State*, 291 Ga. 428 (2) (728 SE2d 592) (2012).

6. In his final enumeration, Pitchford claims that the trial court erred in refusing to give an instruction, upon request by the defense, regarding immunity or leniency granted to a witness. Specifically, Pitchford asserts that this instruction was warranted in connection with the testimony of Martin and Lockhart, who were both discovered in possession of property stolen from Greene and thus potentially faced prosecution for at least some of the crimes charged in the case. However, there was simply no evidence that either Martin or Lockhart were offered any favorable treatment by the State. In fact, Lockhart testified on cross-examination that he had been prosecuted for theft by receiving and affirmed that those charges were not dropped. The trial court did not err, therefore, in declining to give the requested charge. See *Stokes v. State*, 281 Ga. 875 (3) (644 SE2d 116) (2007).

*Judgment affirmed. All the Justices concur, except Melton, J., who concurs in judgment only as to Division 2.*

DECIDED NOVEMBER 25, 2013.

*Sheueli C. Wang*, for appellant.

*Robert D. James, Jr.*, District Attorney, *Deborah D. Wellborn*, Assistant District Attorney, *Samuel S. Olens*, Attorney General, *Patricia B. Attaway Burton*, Deputy Attorney General, *Paula K. Smith*, Senior Assistant Attorney General, *Jason C. Fisher*, Assistant Attorney General, for appellee.