**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**April 17, 2024**

# In the Court of Appeals of Georgia

A24A0548. FRAGA v. THE STATE.

BROWN, Judge.

Raphael Fraga appeals from his convictions of three counts of aggravated assault involving family violence, two counts of cruelty to children in the first degree,[1] harassing communications, criminal trespass, false imprisonment, battery involving family violence, and violating a family violence order.[2] He contends that insufficient evidence supports his convictions of one count of aggravated assault, both counts of

---

[1] The trial court improperly sentenced Fraga on two counts of cruelty to children in the first degree (Counts 2 and 3) when Count 3 was charged and the jury found Fraga guilty of cruelty to children in the third degree. We need not correct this error, however, as we conclude that insufficient evidence supports Count 3.

[2] The trial court sentenced Fraga to 20 years imprisonment with 15 to serve on one of his aggravated assault (family violence) convictions and sentenced him concurrently to equal or lesser amounts of time on the remainder of his convictions.

cruelty to children, and violating a family violence order. He also asserts that the trial court failed to charge the jury on material elements of the crime of aggravated assault involving family violence. For the reasons explained below, we find that insufficient evidence supports Fraga's conviction of cruelty to children in the third degree. We affirm the remaining convictions Fraga contests on appeal.[3]

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, and the appellant no longer enjoys the presumption of innocence." *Ramirez-Ortiz v. State*, 361 Ga. App. 577, 579 (1) (865 SE2d 206) (2021). So viewed, the evidence shows that in April 2020, Fraga met one of the victims ("the girlfriend") while he was working for her next-door neighbor. They started dating a short time later, and he moved in with her and her four children[4] after a few weeks. From the first date, they began doing drugs together, and their relationship quickly became toxic and abusive. They argued loudly every day, and the girlfriend believed that the arguments were always her fault and began to feel powerless. His threats to

---

[3] Fraga raises no alleged error in connection with his convictions of harassing communications, criminal trespass, false imprisonment, and battery (family violence).

[4] At the time of the February 2, 2022 trial, the children were sixteen, nine, seven, and five years old.

murder her and kill himself frightened her. On one occasion a month after they began dating, Fraga choked the girlfriend after she accused him of sleeping with another person. She attributed the loss of her job and friends to her relationship with Fraga, which lasted a total of eight months.

*The Notebook Incident*

On December 18, 2020, Fraga and the girlfriend were fighting, and at some point while they were in their upstairs bedroom, Fraga lit on fire a notebook containing song lyrics he had composed with the girlfriend and placed it on her right leg. The notebook caught the leggings the girlfriend was wearing on fire; she knocked it off "pretty quickly" and put the fire out by pouring a glass of bourbon and coke on it after it landed on the floor. While her leggings were damaged by the burning notebook, she was not injured. The incident did not scare the girlfriend because "she had become desensitized to things." She thought Fraga did it because he was trying to get her attention and "stop [her] from whatever [she] was doing."[5]

---

[5] The girlfriend acknowledged during cross-examination that she could have been high during this incident and that Fraga would become angry if she used methamphetamine that he had purchased without him.

The girlfriend thought her oldest child, a daughter, was in the house at the time of this incident, but she testified that her daughter was not in the room at the time it occurred. The daughter testified that she heard her mother and Fraga arguing, went upstairs into their bedroom, which smelled liked burned carpet, and heard her mom "talking about the notebook on the floor" while Fraga stated that "he was going to burn down the house." The daughter left and took her younger siblings to a neighbor's house. She testified at trial that she came in after the notebook had already been burned, but that the "arguing or yelling or screaming" increased in volume as she walked up the stairs. She did not testify about hearing any sounds or words related to the burning notebook as she walked up the stairs.

*The Attempted Suicide Incident*

After the girlfriend put out the fire, Fraga left the room and went to the garage. A few minutes later, the girlfriend followed him there and asked if he would like to talk. When he declined, she returned to the bedroom, where she saw a Xanax on her desk and placed it in her pocket. They began texting back and forth until she was startled to learn that he had returned to the room and was sitting behind her while they had been texting. Fraga then began yelling in her face about the location of the Xanax

4

pill, and the girlfriend told him that she "had took it because [she] didn't want him to have it." Fraga became very angry, went into the bedroom closet, and "tried to hang himself." The girlfriend was terrified when she heard him struggling to breathe, pushed the door open, pulled him off, and "started kicking him" because she was angry with him for doing that "with [her] kids there." He started yelling, "somebody threw a bottle of beer or glass or something," the girlfriend threw the Xanax pill at him, and he went back into the closet.

At some point, the daughter came upstairs asking her mother about a note Fraga wrote to her "saying that he's sorry he failed for a stepdad . . . or something like that." At this point in time, Fraga was in the closet and the girlfriend did not "have the strength to open [the closet door]." She instructed her daughter to call 911 and get help from a neighbor. According to the girlfriend, her daughter was distraught, crying, and shaking upon learning that Fraga was in the closet.

The daughter testified that she was "scared for [her] mother's life through her relationship with [Fraga]" because Fraga had made previous threats to commit a murder-suicide in the daughter's presence when things were not going his way in an argument with her mother. Whenever the daughter left the house, she was scared

because she "would have that thought in [her] head," and worried that when she returned home "they were both going to be dead."

On the day of the notebook incident, the daughter returned to the bedroom after taking her younger siblings to a neighbor's house and saw Fraga grab a tie and run into a closet to try to hang himself. She and her mother tried to open the door, which was difficult and "really scary, so [she] let [her] mom do it while [she] called the police." She was relieved when the police arrived because she knew Fraga was safe and could not hurt himself anymore. A police officer responding to the 911 call testified that when he arrived, Fraga was "emotionally distraught, hysterical," and being taken care of by paramedics because he had tried to kill himself. After speaking with witnesses, his "investigation turned from a suicide attempt into a domestic violence situation" and he determined that Fraga was the primary aggressor. As a result of his investigation, he took out warrants, but not for the girlfriend.

### The December 27, 2020 Incident

The girlfriend testified that after the notebook/attempted suicide incident, "a TPO [was] filed by DFCS"[6] and Fraga "wasn't allowed to return to the home."

---

[6] The State did not submit a copy of a civil protective order at trial.

Nonetheless, the girlfriend allowed him to come back shortly before Christmas because only her oldest daughter was at home and Fraga "had no family here" or anywhere to stay. She reasoned that "[a]s long as nobody knows, it will be fine." On December 27, 2020, the girlfriend got into a verbal altercation with Fraga, and he took her phone and refused to return it to her. At another point during the argument when she was on the couch, Fraga put "his body weight forward so that [she] couldn't get up or sit up" when she tried to leave the couch. When her daughter and a friend could not reach the girlfriend on her phone, they called 911. The girlfriend testified that the police arrested Fraga, but she did not specify the charges for which he was arrested. Three days later, she found her phone in the refrigerator.

*The Pocketknife Incident*

On January 14, 2021, Fraga convinced the girlfriend that he was sorry and she picked him up from jail. She was drinking and doing drugs during this time, and at some point, became scared[7] and placed a pocketknife in her "bosom area" to protect herself. As she and Fraga were having a verbal altercation, he forecefully advanced while she backed up against a wall. When the knife fell out, Fraga grabbed it and said

---

[7] When she testified at trial, she did not remember what she was fighting about with Fraga that caused her to be afraid of him.

something like "oh, you were going to kill me." The girlfriend "started shaking because [she] was scared that he found the knife." Fraga went into the bedroom with the knife and then came out with the blade open, yelling and "talking not nicely" to the girlfriend. He was standing between the girlfriend and the stairs, which were the only way for her to go to the lower level of the home and escape. As Fraga pointed the knife at her, the girlfriend was afraid that he was going to hurt her with it and did not know if he was going to kill her. She testified that she did not remember how she got into her daughter's room but remembered calling 911 and hiding in a closet until the police arrived.

A patrol officer dispatched to the scene testified that Fraga "acknowledge[d] that he had special conditions of bond, commonly known as the Temporary Family Violence Order" requiring him to stay away from the girlfriend and her residence and that he was not supposed to be there. The officer confirmed that bond conditions were in place through a Georgia Crime Information Center ("GCIC") return. The State also introduced a copy of a document titled "Special Conditions of Bond" signed by a magistrate judge on December 30, 2020, that required Fraga to stay away from the girlfriend and her residence. The top of the document is captioned "State of Georgia

8

v. Raphael P Fraga" and lists a warrant number , but it cannot be determined from the face of the document itself the nature of the crime for which the bond was issued.

1. Fraga argues that insufficient evidence supports his conviction of committing an aggravated assault of the girlfriend in connection with the notebook incident (Count 1) because the girlfriend was not scared or physically injured as a result of the incident and he only intended to commit property damage. We disagree.

"A person commits the offense of aggravated assault when he or she assaults . . . [w]ith . . . any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." OCGA § 16-5-21 (a) (2). "[C]entral to the offense of aggravated assault is that an assault as defined in OCGA § 16-5-20 be committed on the victim. O.C.G.A. § 16-5-21." *Brinson v. State*, 272 Ga. 345, 347 (1) (529 SE2d 129) (2000). A simple assault occurs when a person "[a]ttempts to commit a violent injury to the person of another," OCGA § 16-5-20 (a) (1), *or* when the person "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a) (2).

Count 1 of the indictment alleges that Fraga made an assault upon the girlfriend by placing or throwing "a burning notebook, an object which when used offensively

against a person is likely to result in serious bodily injury," on and at the girlfriend. "Whether the object, device, or instrument at issue in an aggravated assault charge is likely to or does cause serious injury is a jury question. In making that determination, the jury may consider all the circumstances surrounding the [object] and the manner in which it was used." (Citation and punctuation omitted.) *Huff v. State*, 361 Ga. App. 559, 561 (1) (864 SE2d 706) (2021).

In this case, the jury was authorized to conclude that the defendant's conduct in placing a burning object on his girlfriend's leg was likely to cause serious injury. The fact that no serious injury occurred does not mandate a contrary conclusion. See *Brown v. State*, 339 Ga. App. 396, 402 (2) (b) (793 SE2d 573) (2016) ("perpetrator could still be found guilty . . . despite the fact that he . . . did not cause any physical injury to the victim") (citation and punctuation omitted). Finally, the intent with which Fraga acted was "a question of fact for the jury's determination" based on its consideration of Fraga's "words, conduct, demeanor, motive, and all other circumstances connected with the act being prosecuted." *Barnes v. State*, 296 Ga. App. 493, 495 (675 SE2d 233) (2009). We find that the evidence was sufficient for the jury to conclude that Fraga had the requisite intent to commit aggravated assault.

2. Fraga contends that insufficient evidence supports his conviction of cruelty to children in the first degree (Count 2) because his attempted suicide was not done with malice directed at the daughter and he did not know she was in the room. The State charged Fraga with violating OCGA § 16-5-70 (b), which provides that a "person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain."

> For purposes of the crime of cruelty to children in the first degree, malice in the legal sense imports the absence of all elements of justification or excuse and the presence of an actual intent to cause the particular harm produced, or the wanton and willful doing of an act with an awareness of a plain and strong likelihood that such harm may result. Intention may be manifest by the circumstances connected with the perpetration of the offense. Intent is a question of fact to be determined upon consideration of words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

(Citation and punctuation omitted.) *Boles v. State*, 316 Ga. 209, 216 (2) (887 SE2d 304) (2023). The "intent to cause the particular harm is peculiarly a question for the jury in child cruelty cases." (Citation and punctuation omitted.) *Flakes v. State*, 365

11

Ga. App. 97, 99 (a) (877 SE2d 635) (2022). With regard to the excessive physical or mental pain element of cruelty to children in the first degree, "[t]he law does not set a bright line but leaves to the trier of fact, taking into account societal norms generally accepted, whether certain behavior inflicts 'cruel' or 'excessive' pain (in this instance, mental rather than physical pain)." (Citation and punctuation omitted.) *Folson v. State*, 278 Ga. 690, 694 (5) (606 SE2d 262) (2004).

Setting aside the issue of whether Fraga acted with an actual intent to cause the particular harm produced, we conclude that a rational trier of fact could have concluded that his conduct in running into the closet with a tie and attempting to hang himself in the presence of the daughter was done wantonly and wilfully "with an awareness of a plain and strong likelihood that [the particular harm produced] may result." *Boles*, 316 Ga. at 216 (2). While the mother testified that Fraga was already in the closet when her daughter entered the room, the daughter testified to the contrary, stating that she saw Fraga run into the closet with the tie and attempt to hang himself. Additionally, Fraga remained in the closet while the mother and daughter tried to open the door, the mother instructed the daughter to call 911, and the daughter was distraught and crying. And, as pointed out by the State, Fraga had previously

12

threatened on other occasions, in the presence of the daughter, to commit suicide. Finally, at some point before his attempted suicide, he gave the daughter a writing stating that he was "sorry he failed for a stepdad . . . or something like that."

3. Fraga asserts that insufficient evidence supports his conviction of cruelty to children in the third degree (Count 3) because the daughter did not see or hear the burning notebook incident as it occurred. The State alleged in Count 3 of the indictment that the daughter was present to see and hear Fraga's aggravated assault, a forcible felony in which he was the primary agressor, of her mother on the day of the notebook incident. OCGA § 16-5-70 (d) (2) provides that a person commits cruelty to children in the third degree when a "person, who is the primary aggressor, having knowledge that a child under the age of 18 is present and sees or hears the act, commits a forcible felony, battery, or family violence battery." The State contends on appeal that the daughter heard the assault with the burning notebook as it occurred, while Fraga asserts that the daughter heard only "verbal fighting." Having carefully reviewed the evidence, we conclude that the State failed to present sufficient evidence that the daughter saw or heard Fraga place the burning notebook on her mother's leg. Simply put, there was no evidence from which the jury could reasonably conclude that

13

the daughter saw or heard Fraga's "*act* of committing a forcible felony."[8] (Citations

and punctuation omitted; emphasis supplied.) *State v. Owens*, 312 Ga. 212, 222 (5)

(862 SE2d 125) (2021). Rather than seeing or hearing Fraga place the burning

---

[8] In his brief, Fraga argues that a recorded statement of a conversation he had while in jail cannot be used to show that the daughter saw and heard the notebook incident because it is not a corroborated confession. The State does not directly address the import of this statement on the sufficiency of the evidence for Count 3 and merely asserts in passing that the evidence submitted at trial "is sufficient corroboration to authorize a jury verdict on Count 3," because "[k]nowledge of [the daughter's] presence and ability to at least hear the assault in some way as it is occurring suffices under OCGA § 16-5-70 (d)."

The record shows that Fraga's visitor asked "What are your charges?" and Fraga replied,

> There are two felonies basically. . . . One is aggravated assault . . . which is bullshit . . . there was a notebook that I threw at her that was caught on fire . . . that was burnt . . . and . . . that's the aggravated assault. And the other one is . . . because a minor was involved and . . . was in the room and in . . . the situation and the fight and all that shit . . . so those two charges are felonies. . . .

To the extent the State relies on this statement as evidence that the daughter was in the room when Fraga threw the burning notebook on the girlfriend, we find that a rational trier of fact could not have reached such a conclusion from this statement because Fraga was merely summarizing the felony charges against him. This is especially true in light of the mother and daughter's specific and uncontradicted testimony that the daughter was not in the room. See *McCluskey v. State*, 307 Ga. 740, 744 (1) (a) (838 SE2d 270) (2020) ("The ambiguous statement that 'something just told' the grandson to go downstairs, without more, cannot establish that the grandson heard *the act* constituting the underlying offense, particularly in light of his specific and uncontradicted testimony that he did not hear a gunshot.") (emphasis in original).

14

notebook on her mother's leg, the daughter heard non-specific yelling and arguing as she came up the stairs. As in *McCluskey v. State*, 307 Ga. 740 (838 SE2d 270) (2020), the daughter saw only the aftermath of Fraga's act, which is insufficient to show that she saw or heard "*the act* of committing the underlying offense." (Emphasis in original.) Id. at 743 (1) (a).[9]

4. Fraga contends that the State presented insufficient evidence to support his conviction of violating a family violence order in violation of OCGA § 16-5-95 for his conduct on January 14, 2021 (Count 11), because the State failed to prove that the order alleged to be violated was for an "arrest for any act of family violence." We disagree.

OCGA § 16-5-95 (b) provides:

A person commits the offense of violating a civil family violence order or criminal family violence order when such person knowingly and in a nonviolent manner violates the terms of such order issued against that person, which . . . [d]irects the person to stay away from a residence . .

---

[9] Our opinion in *White v. State*, 319 Ga. App. 530 (737 SE2d 324) (2013), is distinguishable because in that case, the two-year-old was in the same room when his mother was attacked. Id. at 533 (3). Similarly, the children in *Owens*, supra, were at close quarters in a minivan when someone was shot. 312 Ga. at 213, 222-223 (5).

. or . . . [r]estricts the person from having any contact . . . with another person, except as specified in such order.

The indictment against Fraga alleged the violation of a criminal family violence order, which is defined to include "[a]ny order of pretrial release issued as a result of an arrest for an act of family violence." OCGA § 16-5-95 (a) (2) (A). An act of family violence under this Code provision "means the occurrence of one or more of the following acts between . . . persons living or formerly living in the same household: (1) [a]ny felony; or (2) [c]ommission of [the] offense[ ] of . . . criminal trespass." OCGA § 19-13-1. See also OCGA § 16-5-95 (a) (3).

The Supreme Court of Georgia has explained that "[i]n Georgia, all crimes are defined by statute" and that "crimes are often defined to include as elements the presence or absence of certain 'attendant circumstances.'" (Citations and punctuation omitted.) *Daddario v. State*, 307 Ga. 179, 184 (2) (a) (835 SE2d 181) (2019). Examination of the statute at issue here shows that the order of pretrial release violated by Fraga must have been "issued as a result of an arrest for an act of family violence," OCGA § 16-5-95 (a) (2) (A), and the State does not dispute this in its brief.

Here, the December 30, 2020 bond order does not expressly state that it was issued in connection with any specific crime or as a result of an arrest for an act of family violence generally. The State, however, presented evidence that Fraga committed acts that amounted to family violence on December 18 and December 27,[10] and that he was arrested in connection with his conduct on those dates. The State urges us to conclude that the jury was authorized to infer from the nature of the conditions in the bond and the fact that Fraga was not immediately arrested after his conduct on December 18, 2020, that the bond conditions were issued in connection with the family violence incident on that date.

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6.

> [T]he trial evidence need not exclude every conceivable inference or hypothesis; it must rule out only those that are reasonable. Principally, the jury is to determine the reasonableness of a defendant's offered theory, and when the jury is authorized to find that the evidence, albeit

---

[10] The indictment alleges that Fraga committed criminal trespass and felony false imprisonment for his conduct on this date. The jury found him guilty of criminal trespass and not guilty of false imprisonment.

circumstantial, is sufficient to exclude every reasonable hypothesis save that of the guilt of the defendant, [Georgia courts do] not disturb that finding unless it is insupportable as a matter of law.

*Daniels v. State*, 298 Ga. 120, 122-123 (1) (779 SE2d 640) (2015). Georgia courts have concluded insufficient evidence supports a conviction when "the evidence supports two equally reasonable hypotheses." *Fox v. State*, 289 Ga. 34, 37 (1) (b) (709 SE2d 202) (2011); *Gee v. State*, 360 Ga. App. 793, 796 (1) (861 SE2d 634) (2021). On the other hand, if the evidence only suggests one reasonable hypothesis, the evidence has been found to be sufficient. See, e.g., *Lumpkin v. State*, 310 Ga. 139, 146 (1) (a) (849 SE2d 175) (2020). Here, the evidence presented only one reasonable hypothesis, that Fraga's bond conditions were "issued as a result of an arrest for an act of family violence," OCGA § 16-5-95 (a) (2) (A), and we cannot conclude that the jury's verdict is "insupportable as a matter of law." *Daniels*, 298 Ga. at 123 (a) (1). We therefore affirm his conviction for violating a family violence order.

5. Fraga argues that plain error resulted from the trial court's failure to specifically instruct the jury that the lack of a sibling relationship between Fraga and the girlfriend was a material element of the crime of aggravated assault (family violence) because it raised the mandatory minimum sentence from one to three years.

18

Compare OCGA § 16-5-21 (i) ("If the offense of aggravated assault is committed between . . . persons excluding siblings living or formerly living in the same household, the defendant shall be punished by imprisonment for not less than three nor more than 20 years.") with OCGA § 16-5-21 (b) ("[A]ggravated assault shall be punished by imprisonment for not less than one nor more than 20 years."). We disagree.

> To show plain error, [Fraga] must establish that (1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, and (3) it affected [his] substantial rights, which ordinarily means showing that it affected the outcome of the trial. If [Fraga] makes that showing, the appellate court has the discretion to remedy the error if it seriously affected the fairness, integrity, or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *Chambliss v. State*, Ga. (3) (896 SE2d 469) (2023). In this case, the girlfriend testified that she met Fraga through a neighbor before they began romantically seeing one another, and we decline to find that the omitted instruction affected Fraga's substantial rights or the outcome of the trial. See *Loftland v. State*, 357 Ga. App. 92, 98-99 (2) (850 SE2d 175) (2020) (finding no plain error resulted from trial court's failure to charge that a spousal relationship was a material element of the crime because fact of marriage was never disputed and the

19

parties testified that they were married). Cf. *Outz v. State*, 344 Ga. App. 616, 617 (1) (810 SE2d 678) (2018) (jury could conclude from evidence about how the victim and the defendant met before becoming romantically involved that they were not siblings).

*Judgment affirmed in part, reversed in part. Dillard, P. J., and Padgett, J. concur.*