310 Ga. 139
FINAL COPY

S20A0734.  LUMPKIN v. THE STATE.
S20A0879.  GREEN v. THE STATE.

BETHEL, Justice.

A Gwinnett County jury found Anthony Lumpkin and Eddie Green guilty of murder and other offenses in connection with the shooting death of Nicholas Jackson II. Both appellants argue that the trial court erred by denying their motions to suppress evidence seized during a traffic stop. In addition, Lumpkin challenges the sufficiency of the evidence presented against him on the armed robbery count and the felony murder count predicated on armed robbery, and Green argues that the trial court erred by not admitting certain evidence pursuant to OCGA § 24-8-804. Because each of these enumerations of error fail, we affirm in part, but we also vacate in part to correct a sentencing error with respect to Lumpkin.[1]

---

[1] The crimes occurred on February 2, 2012. On April 25, 2012, a Gwinnett

County grand jury indicted Lumpkin, Green, Darrez Chandler, Michael Davis, Jason Dozier, Timothy Johnson, and Reco West on 16 charges. Pertinent to this appeal, all seven defendants were charged with malice murder (Count 1), felony murder predicated on armed robbery (Count 2), felony murder predicated on aggravated assault (Count 3), felony murder predicated on burglary (Count 4), armed robbery (Count 5), aggravated assault (Count 6), and burglary (Count 7). Lumpkin was also indicted for possession of a firearm during the commission of a felony (Count 10) and possession of a firearm by a convicted felon (Count 14). Green was indicted for possession of a firearm by a convicted felon (Count 13). The remainder of the indictment did not pertain to Lumpkin or Green.

Chandler, Davis, Dozier, Johnson, and West were not tried with Lumpkin and Green. Chandler and Johnson each pled guilty to armed robbery, aggravated assault, and battery and testified for the State at Lumpkin and Green's trial. Their cases are not part of this appeal. Davis, Dozier, and West were each tried individually, found guilty of various offenses arising from this incident, and sentenced. This Court affirmed their respective convictions and sentences on appeal. See *Dozier v. State*, 307 Ga. 583 (837 SE2d 294) (2019); *Davis v. State*, 306 Ga. 764 (833 SE2d 109) (2019); *West v. State*, 305 Ga. 467 (826 SE2d 64) (2019).

At a joint jury trial held from November 12 to 25, 2013, Lumpkin was found guilty of Counts 1 through 7 and 10. The trial court entered an order of nolle prosequi as to Count 14. Green was found not guilty of Count 1 but guilty of Counts 2 through 7. The trial court entered an order of nolle prosequi as to Count 13.

Lumpkin and Green were sentenced on December 6, 2013. Lumpkin was sentenced to a term of life imprisonment without the possibility of parole for malice murder, a consecutive term of life imprisonment for armed robbery, a consecutive term of imprisonment of twenty years for aggravated assault, a consecutive term of imprisonment of twenty years for burglary, and a consecutive term of imprisonment of five years for possession of a firearm during the commission of a felony. As to Lumpkin, the trial court purported to merge the three felony murder counts into the malice murder count, but those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Green was sentenced to a term of life imprisonment for felony murder predicated on armed robbery. The remaining felony murder counts were vacated by operation of law, and the trial court purported to merge the remaining counts. The State has not challenged Green's sentences, and we decline to address them. See *Dixon v. State*, 302 Ga.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In September 2011, Kevell Ross contacted his stepbrother, Timothy Johnson, requesting his assistance in robbing a house in Norcross that belonged to a drug dealer who supplied cocaine to Ross. The man who owned the house, Nicholas Jackson, Sr., lived there with his wife and four children, who included Nicholas Jackson II, the victim. Later that fall, Ross met with Johnson, Darrez Chandler, and Green to discuss the robbery. The group initially planned to rob the house in December 2011. They recruited other individuals to assist but

691, 696-698 (4) (808 SE2d 696) (2017).

On December 9, 2013, Lumpkin filed a motion for new trial, which he amended on March 27, 2015. The trial court held a hearing on the motion, as amended, on March 31, 2015, and denied the motion on April 4, 2018. Lumpkin filed a notice of appeal on May 4, 2018.

On December 10, 2013, Green filed a motion for new trial, which he later amended six times through new counsel. The trial court held hearings on the motion, as amended, on January 19, 2016, and February 2, 2018. On December 14, 2017, the trial court denied Green's motion for new trial on the grounds alleged in his original motion and the first five amended motions. On April 3, 2018, the trial court denied Green's motion for new trial on the grounds alleged in his sixth amended motion. Green filed a notice of appeal on May 2, 2018.

After the records were transmitted, these cases were docketed to this Court's April 2020 term, were submitted for decisions on the briefs, and have been consolidated for opinion.

decided to abandon the robbery when they saw a car with a woman and child inside drive up to the house.[2]

On February 2, 2012, Chandler, Johnson, and Green decided to attempt the robbery again, and Lumpkin, Jason Dozier, Michael Davis, and Reco West were recruited to assist. The group planned that Chandler and Johnson would remain in their vehicles while Lumpkin, Dozier, Davis, and West would initially enter the home. Green was to join them inside later to assist in the search for money. Lumpkin, Dozier, Davis, and West were to be armed; Green was not.

Before the robbery, Lumpkin instructed Green to pick up Davis and West. Green relayed the instructions to Johnson, and, at

---

[2] The individuals were identified at trial only as "Josh," "Meko," "Country," and "Slab." They were not involved in the February 2, 2012 robbery of the home. During the initial attempt, Johnson drove Green to the house in his truck, while Chandler drove the other men in his car. According to the initial plan, Johnson and Chandler would remain in their respective vehicles. The occupants of Chandler's vehicle would initially enter the home armed and "do the hard work," and Green would later join in efforts to search the home for money. Cell phone tower data presented to the jury indicated that on December 14, 2011, cell phones belonging to Green, Chandler, and Johnson each traveled from Atlanta to Norcross at approximately the same time, where they utilized cell phone towers near the Jacksons' home. Cell phone tower data from February 2, 2012, showed that the three cell phones utilized the same towers near the Jacksons' house at the time of the incident.

Green's request, Johnson drove Green to pick up Davis and West in a silver van that Green had provided. Johnson then drove Green, Davis, and West in the van to the house in Norcross. Meanwhile, Chandler separately drove Lumpkin and Dozier in his car, stopping at a store at Lumpkin's direction to purchase duct tape on the way "just in case" someone was home during the robbery.

As Johnson's group got close to the house, Green called Chandler's group, informing them that he wanted to show the house to the men in his van, after which Johnson's group circled the house in the van, then parked in a nearby parking lot to wait for Chandler's group. While there, Green called Chandler's group several times to check on their status. After Chandler's group arrived, Lumpkin and Dozier got into the silver van, which then proceeded to the house. Chandler drove to and parked in a different parking lot nearby.

The van arrived at the house, and Johnson noticed a vehicle parked in the driveway. He expressed concern to the others in the van about going ahead with the robbery with the potential for women or children to be in the house. Lumpkin replied that "we

5

didn't come up here for nothing" and that Johnson should not "start that s***." Green then waved at Johnson, indicating that he should pull the van into the driveway. Lumpkin then said that he was "going to smash this b**** in" and that the others should follow him into the house.

Lumpkin, Dozier, Davis, and West approached the entrance to the home's basement on foot. Green and Johnson waited in the van, and Green instructed Johnson to pull away from the house and circle the block. Johnson and Green heard gunfire just as they arrived back at the house, and they decided to remain in the van. Lumpkin, Davis, Dozier, and West, who were still armed, exited the house and got into the van, which Johnson then drove away.

Lumpkin had called Chandler as the four men walked up to the house, and Chandler stayed on the line with him while the group went inside. Over the phone, Chandler could hear a door being kicked in, followed by commotion and gunshots. Chandler then heard Lumpkin say, "This man dead." The phone hung up, but Chandler called Lumpkin back. Lumpkin told him, "the man dead."

While in the van, Lumpkin told Johnson and Green that someone had been shot. Lumpkin told them, "There was a young n***** in there, man. He was bucking. . . . Man, I kept telling him to open the damn door. He wouldn't open that damn door."

At the time of the incident, Jackson's sister, Nikia Jackson, was in her bedroom on the third floor. She heard "popping" noises and went downstairs because she thought Jackson was bouncing a basketball. When she got to the main floor of the house, she heard people yelling and a vehicle's tires screeching. Out the window, she could see a silver van leaving the driveway with five men inside.

She then began looking for Jackson, and eventually found him lying unresponsive on the ground of his basement bedroom, behind his bedroom door. She observed holes in his bedroom door and saw that Jackson's bedroom was in disarray. Nikia called 911 and reported that her brother had been shot. She reported that five or six males had driven away from the house in a silver van.

Emergency medical personnel responded to the house, where they found Jackson unresponsive. He was transported to a local

hospital, where he was later pronounced dead. An autopsy revealed that Jackson died from a single gunshot wound to the chest. The medical examiner recovered a projectile during the autopsy, which was provided to law enforcement.

Shortly after the shooting, a Norcross police officer was conducting a traffic stop less than a mile from the Jacksons' house. He was notified about a call reporting a burglary. Minutes later, after the officer concluded the stop, he began driving toward the Jacksons' house. While driving, he received updated information from dispatch indicating that the incident involved a home invasion and shooting and that five subjects had run from the house to a silver van. About a minute later, the officer spotted a silver van at a nearby intersection. The officer then pulled in behind it and activated his patrol car's blue lights. He then called for backup, indicating that he believed he was behind the van identified in the call.

The men in the van saw the patrol car, and Lumpkin, Dozier, Davis, and West told Johnson, who was still driving, not to pull over

and to drive faster. They then began handing Green their guns, one of which Green threw out the window.

Johnson stopped the van at the next intersection, but as the officer exited his patrol car, Johnson made a right turn. The officer reentered his car and tapped his siren twice in order to get Johnson's attention. Johnson then made another right turn at the next street and stopped. The officer approached the van and held its occupants at gunpoint while awaiting backup. Green then hit a button that opened the van's back door. West and Lumpkin fled from the vehicle on foot and hid in bushes nearby. They were apprehended by other officers shortly thereafter.

Inside and around the van, law enforcement officers located four firearms, a ski mask, a stocking cap, several sets of latex gloves, duct tape, and a laptop belonging to Jackson's mother. They also collected several of the men's cell phones. In addition, they found Lumpkin's cell phone and a ski mask in the bushes where he and West had been hiding and found a second ski mask and Lumpkin's shoes nearby. After they were apprehended by law enforcement,

9

gunshot residue was found on the hands of Lumpkin, Dozier, Davis, and West.

At the house, investigators found a shoeprint on the basement door that was consistent with Lumpkin's shoe. They also found bullet holes on the outside of Jackson's basement bedroom door as well as corresponding defects in various locations in the bedroom. Investigators located shell casings and projectiles in various areas in the basement, which investigators later determined had been fired from two of the firearms found in the silver van. Investigators also determined that one of those firearms had fired the bullet recovered from Jackson's body.

During a custodial interview, after receiving *Miranda* warnings,[3] Green claimed that some people had approached him and Johnson requesting a ride to the Mall of Georgia from Atlanta. Green said that he did not know any of their names but obliged their request because they offered him gas money. Green also told

---

[3] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

10

investigators that he was asleep during the entire trip to Norcross and that he only awoke when the van was stopped by police. When asked if he had any nicknames, Green did not mention the nickname "Tiger," and he denied having a cell phone.

Chandler and Johnson testified that they knew Green as "Tiger" and that Green had helped plan and commit the robbery, including by providing the silver van. The State also presented testimony from an auto shop owner, who stated that he also knew Green as "Tiger"; that on the day before the home invasion, Green had driven the silver van to his shop; and that Green provided him with his cell phone number. Johnson testified that the story Green told about going to the Mall of Georgia was "concocted" in the van as the group fled from the house after the shooting. One of the phones recovered during the search of the van belonged to Green. Contact information for Johnson, Chandler, Davis, and Lumpkin was stored in Green's phone. The State also presented evidence that Green communicated with Lumpkin several times since at least November 2011 and that Green had communicated with Davis several times

11

since January 2012 — including a text from Davis on the day before the home invasion that stated, "What's da move?" A witness testified that the term "move" is often used to refer to a burglary, armed robbery, or similar crime. Cell phone records indicate that Green made and received several calls from Lumpkin, Chandler, and Davis in the afternoon and early evening on the day of the crimes.

Lumpkin also had contact information for Chandler, Green, and Johnson stored in his phone. The State presented evidence that Lumpkin sent a text to an unidentified female on February 2 stating that he was "tryna pull one."

The State also presented evidence of phone calls that Green and Lumpkin made from jail. In one call, Green mentioned to a friend that officers had recovered his cell phone and stated that he had been trying to show West and Davis "what money looked like." In another call, Lumpkin told a friend that he kicked in the door at the Jacksons' house.

Green did not testify at trial. Lumpkin testified and stated that, on the day of the shooting, Chandler asked him to ride with

him but did not tell him where they were going. Lumpkin testified that when he and Chandler arrived at the Jacksons' house, Chandler indicated that they were there to commit a robbery. Lumpkin testified that he initially refused but that he eventually went to the house and kicked the door several times. He claimed that he then saw someone inside the house and decided to walk away, at which point he got into a silver van.

(a) Lumpkin argues that the evidence presented was insufficient as a matter of due process to support the jury's verdict as to the armed robbery count and the felony murder count predicated on armed robbery. These contentions fail.[4]

First, each of the felony murder counts against Lumpkin were vacated by operation of law because he was also found guilty of malice murder, and he was not sentenced for felony murder. See

---

[4] Lumpkin argues that the evidence was insufficient to support the jury's verdicts and that the trial court erred by denying his motion for a directed verdict of acquittal. The test established in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), is the proper standard of review when the sufficiency of the evidence is challenged on appeal, regardless of whether the challenge arises from the denial of a motion for a directed verdict or the denial of a motion for new trial in which the sufficiency of the evidence is challenged. See *Stansell v. State*, 270 Ga. 147, 148 (1) (510 SE2d 292) (1998).

13

footnote 1, above. Lumpkin's challenge with regard to the felony murder count predicated on armed robbery is therefore moot. See *Mills v. State*, 287 Ga. 828, 830 (2) (700 SE2d 544) (2010).

Second, the evidence presented was sufficient to support the jury's verdict as to the armed robbery count. When evaluating the sufficiency of evidence as a matter of federal due process under the Fourteenth Amendment to the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

OCGA § 16-8-41 (a) provides, in relevant part, that "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the

14

immediate presence of another by use of an offensive weapon[.]" Here, the indictment alleged that the armed robbery occurred when a laptop belonging to Jackson's mother was taken from Jackson's immediate presence by the use of a firearm.

Although Lumpkin and the State stipulated at trial that the laptop recovered from the silver van belonged to Jackson's mother, Lumpkin argues that there was no evidence that a taking occurred in Jackson's "immediate presence," as required by OCGA § 16-8-41 (a). He argues that Jackson's mother did not testify as to the laptop's location at the time of the incident and that her statements about Jackson's use of the laptop were mere speculation. Lumpkin also argues that, under this Court's decision in *Fox v. State*, 289 Ga. 34 (709 SE2d 202) (2011), the evidence was insufficient to support the jury's guilty verdict on the armed robbery count because there was no evidence as to whether the laptop was taken before or after the perpetrators confronted Jackson. We disagree with both contentions.

First, the evidence supported a finding that the laptop was

taken "from the person or the immediate presence" of Jackson. Jackson's mother testified that Jackson often used her laptop in his basement-level bedroom. Moreover, based on physical evidence at the scene and the testimony of Jackson's sister, who was home and in her upstairs bedroom at the time of the incident, the jury could infer that the laptop was in the basement and that the perpetrators only reached that level of the house during the incident. Specifically, Nikia Jackson only heard noises coming from the basement where Lumpkin and the others had entered the house and where Jackson's bedroom was located, and there was no damage or other sign of violence or confrontation anywhere in the house other than the basement. Because Jackson was in the basement at the time and the basement area was under his immediate control, the evidence presented at trial was sufficient to satisfy the "immediate presence" requirement for armed robbery. See *Dozier v. State*, 307 Ga. 583, 585 (837 SE2d 294) (2019) (considering sufficiency of evidence of armed robbery for one of Lumpkin's co-defendants).

As to the second issue, the State is required to prove beyond a

16

reasonable doubt that the defendant's use of an offensive weapon occurred shortly "prior to or contemporaneously with the taking." (Citation and punctuation omitted.) *Benton v. State*, 305 Ga. 242, 245 (1) (b) (824 SE2d 322) (2019). Lumpkin argues that this case mirrors the facts of *Fox*, where we determined that the evidence was insufficient as to an armed robbery charge because it supported "two equally reasonable hypotheses" — that the defendant surreptitiously took possession of the stolen property before confronting the victim (who was later found dead in a room near where the property had been kept) or that the defendant confronted and killed the victim before taking the items. *Fox*, 289 Ga. at 37 (1) (b).

But as in *Benton*, no evidence presented at trial supports Lumpkin's contention that the theft of the laptop occurred before the perpetrators' use of force against Jackson. See *Benton*, 305 Ga. at 245 (1) (b). Here, an exterior door was kicked in, and four armed men rushed inside to the house's basement, where Jackson's bedroom was located and where he was at the time. The evidence allowed the

jury to infer that there was then immediate commotion, that the perpetrators fired multiple gunshots in the basement's common area, and that they continued firing into Jackson's bedroom, eventually hitting him with a single, fatal gunshot after he refused to open his bedroom door. In contrast to *Fox*, there was no evidence that the perpetrators' entry into the house was surreptitious or that Jackson confronted them only after they had taken the laptop. Instead, the evidence suggested only that the taking of the laptop occurred during or soon after the perpetrators' sudden and fatal confrontation with Jackson. The evidence was therefore sufficient to support the jury's guilty verdict on the armed robbery count. See *Dozier*, 307 Ga. at 585 (affirming armed robbery conviction of Lumpkin's co-defendant); *Davis v. State*, 306 Ga. 764, 766 (1) (833 SE2d 109) (2019) (same). See also *Hester v. State*, 282 Ga. 239, 240 (2) (647 SE2d 60) (2007) ("It is well-settled that a defendant commits a robbery if he kills the victim first and then takes the victim's property." (citation and punctuation omitted)).

(b) Lumpkin has not challenged the sufficiency of the evidence

presented at trial as to the remaining counts for which he was found guilty and sentenced: malice murder, aggravated assault, burglary, and possession of a firearm during the commission of a felony. However, in accordance with this Court's practice in murder cases, we have reviewed the evidence presented as to those counts.[5] When viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Lumpkin guilty beyond a reasonable doubt of each of these crimes. See *Dozier*, 307 Ga. at 585 (affirming malice murder, burglary, and firearms possession convictions of Lumpkin's co-defendant); *West v. State*, 305 Ga. 467, 470 (1) (a) (826 SE2d 64) (2019) (affirming malice murder conviction of Lumpkin's co-defendant). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the

---

[5] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 392 (4) (846 SE2d 83) (2020). The Court began assigning cases to the December Term on August 3, 2020.

evidence." (citation and punctuation omitted)).

(c) Green has not challenged the sufficiency of the evidence presented at trial as to the only count for which he was found guilty and sentenced: felony murder predicated on armed robbery. However, we review sua sponte the evidence presented against him as to that charge.

Like Lumpkin, Green was charged as a party to the crimes of armed robbery and felony murder predicated on armed robbery. As we discussed in Division 1 (a) above, the evidence presented at trial was sufficient to support the jury's verdict that the crime of armed robbery occurred. Although there is no evidence that Green directly committed any of the crimes, evidence of his involvement in the planning of the robbery as well as his presence, companionship, and conduct with other perpetrators before, during, and after the robbery supported the jury's conclusion that Green was a party to the armed robbery. See *Heard v. State*, 306 Ga. 76, 82 (2) (844 SE2d 791) (2020); OCGA § 16-2-20. And because the evidence authorized the jury to find that Jackson's death occurred during the commission

20

of that felony, the evidence was sufficient to support the jury's guilty verdict on the felony murder count predicated on armed robbery. See OCGA § 16-5-1 (c).

2. Green argues that the trial court abused its discretion by not admitting Dozier's statements to a police investigator suggesting that Green had not been involved in the planning and execution of the robbery. Green argues that because Dozier was legally unavailable to testify at trial, his statements should have been admitted pursuant to the exception to the hearsay rule for statements against interest set forth in OCGA § 24-8-804 (b) (3).

The record shows that Dozier and his counsel met with prosecutors in March 2012. At the time, Dozier and several of the other perpetrators had been arrested but not yet indicted. The record reflects that the State had provided Dozier with a letter offering immunity in exchange for any information he was willing to provide about the crimes. In its filings before the trial court, the State characterized its offer as a "promise of complete testimonial immunity in that the State provided Dozier with a written

agreement that any statements he provided, or any evidence derived from his statements, would not be used against him." The State represented to the trial court that Dozier met with the State and gave statements to prosecutors under the promise of that immunity. Green's motion to admit Dozier's statements indicated that Dozier said that he "did not know why Green was present because he had nothing to do with the planning of the home invasion." Green's counsel also indicated to the trial court that Dozier stated that Green "was never there doing a plan" and that he "didn't know anything about them doing a plan." Dozier also informed the State that the "only people involved" were himself, Johnson, and Chandler. Dozier's case was later severed from that of his other co-defendants because of the information he had provided to the State under the promise of immunity.

Dozier apparently recanted some of the statements he made to the investigators. He would later stand trial and be convicted of several offenses in connection with this incident. See *Dozier*, 307 Ga. at 583 n.1. He was subpoenaed to testify at Green and Lumpkin's

trial, but by the time it began, Dozier had already been convicted and was seeking a new trial. He asserted his Fifth Amendment privilege against self-incrimination and refused to testify.

Pertinent to this appeal, a declarant is "unavailable as a witness" if the declarant is "exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement[.]" OCGA § 24-8-804 (a) (1). Here, the trial court accepted Dozier's assertion of his Fifth Amendment privilege, which made him legally unavailable under OCGA § 24-8-804 (a) (1). See *Shealey v. State*, 308 Ga. 847 (2) (b) (843 SE2d 864) (2020) (witness's "invocation of his Fifth Amendment privilege against compelled self-incrimination, once accepted by the trial court, made him 'unavailable as a witness'" under OCGA § 24-8-804 (a) (1)). The State has never challenged that ruling.

We now turn to whether the trial court abused its discretion by not admitting Dozier's statements pursuant to OCGA § 24-8-804 (b) (3), which provides that a statement against interest "shall not be excluded by the hearsay rule if the declarant is unavailable as a

witness[.]” The rule further provides that a statement against interest is a statement:

> (A) Which a reasonable person in the declarant’s position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant’s proprietary or pecuniary interest or had so great a tendency to invalidate a claim by the declarant against another or to expose the declarant to civil or criminal liability; and
> (B) Supported by corroborating circumstances that clearly indicate the trustworthiness of the statement if it is offered in a criminal case as a statement that tends to expose the declarant to criminal liability[.]

OCGA § 24-8-804 (b) (3) is materially identical to Federal Rule of Evidence 804 (b) (3). Thus, although there is a body of Georgia case law concerning the use of hearsay statements against a declarant’s interests that was in place before the current Evidence Code came into effect, see, e.g., *Timberlake v. State*, 246 Ga. 488, 492 (1) (271 SE2d 792) (1980), we look to federal appellate decisions, particularly those of the United States Supreme Court and the Eleventh Circuit construing Federal Rule 804 (b) (3), in interpreting OCGA § 24-8-804 (b) (3). See *State v. Orr*, 305 Ga. 729, 736 (3) (827 SE2d 892) (2019); *State v. Almanza*, 304 Ga. 553, 556-557 (2) (820

SE2d 1) (2018).

Here, the trial court found that Dozier made his statements to the State's investigators under a promise of use and derivative-use immunity. As a result, the trial court determined that Dozier's statements regarding Green's lack of involvement in the crimes could not expose Dozier to criminal liability and were therefore not against his penal interests. The trial court instead noted that, at the time Dozier made the statements, they were actually in Dozier's interests.

We see no abuse of discretion in the trial court's ruling. We agree that a statement given under a promise of use and derivative-use immunity is not against the declarant's penal interest. As we have previously noted, use and derivative-use immunity protect a witness from the use of potentially self-incriminating testimony and the fruits of that testimony against him in a future prosecution. See *State v. Hanson*, 249 Ga. 739, 741 (1) (295 SE2d 297) (1982). Because such statements do not expose the declarant to criminal liability, they are not against the declarant's penal interests and are not

admissible under OCGA § 24-8-804 (b) (3). See *United States v. Slatten*, 865 F3d 767, 805-806 (VII) (B) (2) (D.C. Cir. 2017) (co-defendant's statement not admissible as a statement against interest where the statement was immunized); *United States v. Williams*, 809 F2d 1072, 1083 (II) (B) (5th Cir. 1987) (declarant's statements made to federal agents under grant of immunity were not statements against interest); *United States v. Gonzalez*, 559 F2d 1271, 1273 (5th Cir. 1977) (grand jury testimony given under a grant of immunity is not a statement against interest). See also *Olds v. State*, 299 Ga. 65, 73 (2) n.12 (786 SE2d 633) (2016) (noting that after the Eleventh Circuit was carved out of the old Fifth Circuit, the Eleventh Circuit adopted all decisions of the former Fifth Circuit adopted prior to October 1, 1981, as binding precedents, thus making decisions of the former Fifth Circuit part of the decisional law of the Eleventh Circuit).

Because we determine that the trial court did not abuse its discretion by determining that Dozier's statements were not admissible as statements against interest under OCGA § 24-8-804

(b) (3), we need not consider whether the trial court abused its discretion by determining that the statements were not sufficiently corroborated. This enumeration of error fails.

3. Both Lumpkin and Green assert that the trial court erred by denying their pre-trial motions to suppress evidence obtained in a search of the van after it was stopped by a police officer. We see no error.

In reviewing a ruling on a motion to suppress, we review the trial court's factual findings for clear error and its legal conclusions de novo. See *Kennebrew v. State*, 304 Ga. 406, 409 (819 SE2d 37) (2018). At a pre-trial hearing on the appellants' motions, the officer who conducted the stop testified that around the time of the incident, he was conducting an unrelated traffic stop when he received a call from the police dispatch regarding a burglary at the Jacksons' house on Autry Street in Norcross. At that time, the officer was approximately three-quarters of a mile from the house. Minutes later, after the officer concluded the stop, he began driving toward the Jacksons' house. While driving, he received updated information

27

from dispatch indicating that the incident involved a home invasion and shooting. Dispatch advised officers that a witness in the house had reported seeing five men running up the house's driveway to a silver van, which then drove away. About a minute later, the officer observed a silver van driving southbound on West Peachtree Street. The officer knew that West Peachtree Street intersected Autry Street and that "the only way to exit Autry Street is onto West Peachtree Street." Due to dark window tinting on the van, the officer could not, at that time, see how many people were inside.

The officer then began following the vehicle and activated his blue lights to initiate a traffic stop. The van stopped at an intersection, and the officer exited his vehicle to walk toward the van. The van then made a right turn at the intersection. The officer re-entered his vehicle and tapped his siren twice. The vehicle then made another right turn onto an adjacent street and came to a stop. The officer then approached the vehicle and saw two men, later identified as Lumpkin and West, exit the van and run away. The officer, who by that time had been joined by another officer, held four

men in the van at gunpoint and then proceeded to search the van. The search yielded significant evidence.

Lumpkin and Green argued that the officer did not have sufficient suspicion to conduct the stop because his only information at the time was that he should be looking for a silver van with five men inside. They argued that, when the officer first observed the van, he could not see how many people were inside, nor had he observed the van committing any traffic violations.[6] The trial court denied the motions to suppress, determining that the stop was justified by the officer's receipt of a description of the silver van, the fact that he observed it close in time and near the location of the reported crime scene, and the fact that the van was coming from the direction of the crime scene on the only road from which a vehicle could exit the street on which the house was located.

---

[6] The trial court found that after the officer activated his blue lights, made an initial stop of the van, and exited his vehicle, the van drove away, precipitating further pursuit of the van by the officer. However, because we determine that the officer's response to the lookout call gave him sufficient suspicion to initiate the stop, we need not consider whether other grounds, such as a potential traffic violation, might have justified the stop.

The traffic stop in this case was a *Terry* stop. See *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LE2d 889) (1968). *Terry* permits an officer to conduct a brief investigative stop of a vehicle if the officer has "reasonable, articulable suspicion that a crime may have been committed." *Stafford v. State*, 284 Ga. 773, 774 (671 SE2d 484) (2008). Such a stop must be justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U. S. at 21 (III). Articulable suspicion is "less than probable cause, but greater than mere caprice." (Citation and punctuation omitted.) *Stafford*, 284 Ga. at 774. An officer may conduct a *Terry* stop based on information received in a police lookout call, sometimes called a "be on lookout" or "BOLO," so long as the officer conducting the stop articulates specific facts which, together with rational inferences drawn therefrom, provide a reasonable basis for the stop. *Humphreys v. State*, 287 Ga. 63, 75 (7) (694 SE2d 316) (2010), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 698 (820 SE2d 640) (2018). Where an officer lacks reasonable suspicion to stop a vehicle, the

traffic stop violates the Fourth Amendment, and evidence obtained as a result of the stop must be suppressed. See *Jones v. State*, 291 Ga. 35, 38-39 (2) (727 SE2d 456) (2012).

The traffic stop here was valid under *Terry*. The officer received a description of the getaway vehicle from dispatch. He then observed a vehicle matching that description less than a minute from the time he received the description and less than a mile from the reported crime scene. See *Humphreys*, 287 Ga. at 75 (7) (noting that "the short time between the transmission of the lookout and [the officer's] spotting the vehicle made it even more likely that the vehicle he saw was in fact the vehicle described in the lookout."); *McNair v. State*, 267 Ga. App. 872, 874 (1) (600 SE2d 830) (2004) (stop justified where officer observed vehicle matching description given in BOLO coming from the area of the crime scene within minutes of the BOLO being issued). These observations gave the officer adequate suspicion to activate his blue lights, initiate the initial vehicle stop, and then stop the vehicle again after a brief pursuit. Accordingly, the officer conducted a valid *Terry* stop of the van, and the trial court did not

err by denying the appellants' motions to suppress.

4. We have identified a sentencing error with respect to Lumpkin (Case No. S20A0734). The trial court sentenced Lumpkin for both malice murder and aggravated assault. But, as charged in the indictment, the malice murder charge and the aggravated assault charge were both based on the gunshot that struck Jackson in the chest and killed him. The trial court should have merged those crimes, and because it did not, we vacate Lumpkin's conviction and sentence for aggravated assault. See *Reddings v. State*, 292 Ga. 364, 367 (2) (738 SE2d 49) (2013).

*Judgment affirmed in part and vacated in part in Case No. S20A0734. Judgment affirmed in Case No. S20A0879. All the Justices concur.*

Decided September 28, 2020.

Murder. Gwinnett Superior Court. Before Judge Tom Davis.

*Wayne L. Burnaine*, for appellant (case no. S20A0734).

*Clark & Towne, Jessica R. Towne*, for appellant (case no. S20A0879).

*Daniel J. Porter, District Attorney, Lee F. Tittsworth, Samuel R. d'Entremont, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.