321 Ga. 751
FINAL COPY

S25A0255. THE STATE v. MICKEL.

COLVIN, Justice.

On June 23, 2023, law enforcement officers, acting without a warrant, approached Appellee David Mickel with their guns drawn, ordered him to get on the ground, handcuffed him, searched his person and his bag, placed him in the back of a patrol car, and transported him to the East Point police station for an interview. In response to Mickel's many questions, officers assured him that he was merely being detained and that he had not been charged with any crime. During the subsequent interview, Mickel waived his *Miranda* rights[1] and made statements that the State now seeks to use against him at trial for malice murder and other crimes related to the shooting death of Michael Anthony Thomas.

The trial court conducted a pretrial evidentiary hearing in

---

[1] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

which law enforcement officers testified that they did not have probable cause to arrest Mickel at the time of his seizure. The trial court agreed. It issued a written order concluding that law enforcement's warrantless encounter with Mickel amounted to a "full-blown custodial arrest," and that although the evidence "raised [a] reasonable suspicion that would have been sufficient for [a] second-tier detention of" Mickel, it fell short of the probable cause necessary to arrest him. The trial court accordingly concluded that officers had violated Mickel's Fourth Amendment rights and suppressed his statements "as fruit of the poisonous tree of his illegal seizure."

In its sole enumeration of error, the State contends that Mickel's arrest was supported by probable cause. We cannot determine whether the trial court erred in this regard, however, because, as explained further below, its two orders addressing Mickel's statements, dated August 19 and August 28, 2024, do not allow for meaningful appellate review of the trial court's decision. We accordingly vacate the portions of the trial court's orders

2

concerning its probable cause determination and its associated ruling suppressing Mickel's statements, and we remand for further proceedings consistent with this opinion.

1. Prior to trial, the State moved in limine for a ruling that Mickel's statements to law enforcement were admissible, and Mickel filed a cross-motion to suppress. The trial court held pretrial evidentiary hearings related to the parties' motions on August 6 and August 16, 2024, during which the State presented the testimony of Sergeant Richard Michaud and Assistant Detective Carlos Leary of the East Point Police Department.

(a) Sergeant Michaud testified that on Friday, June 9, 2023, the East Point Police Department received a 911 call from an unknown male caller, later identified as Thomas, who reported that he had been shot, that he was in the trees off of Camp Creek Parkway, and that he was dying.[2] According to Sergeant Michaud, the caller did not respond to further questions from the 911

---

[2] Thomas's 911 call was not played for the trial court or entered into evidence at the pretrial motions hearing and is not a part of the record on appeal.

3

dispatcher.

Sergeant Michaud was in the office when the call came in. According to Sergeant Michaud, he and other officers made an "incident request" to the network carrier associated with the caller's cell phone number and pinged his phone to determine the nearest cell tower. Officers then "saturated the area" from which the ping originated and employed K-9s and drones to find the caller, but they were unable to locate him.

According to Sergeant Michaud, a passerby called 911 five days later (on June 14, 2023) to report finding a body near Camp Creek Parkway. When officers responded, they found that the decedent still had his wallet on his person, which they used to identify him as Thomas. Further investigation prior to Mickel's arrest revealed a shell casing near Thomas's body that officers believed was linked to his death.

Sergeant Michaud testified that his office received a tip that Thomas's death may have been related to an altercation on a MARTA bus which took place shortly before Thomas's 911 call.

Sergeant Michaud contacted MARTA police, and on June 22, 2023, MARTA police provided him with security footage from the bus's interior and exterior cameras. The bus's interior cameras recorded both audio and video, but the exterior cameras only recorded video.

The State did not play the security footage from the MARTA bus at the hearing or admit it into evidence. Instead, the State solicited testimony about the video from Sergeant Michaud. According to Sergeant Michaud, the footage showed that as the bus pulled up to the bus stop, Thomas "r[an] up in front of" a young man and got on the bus, and then the young man got on after Thomas. Though Thomas got on first, he remained standing and let the other man pass. According to Sergeant Michaud, the video shows that the young man was holding a gun in his hand but that he was not pointing it at Thomas or at anyone else. Then, as the young man passed Thomas, Thomas "be[gan] striking" him. Sergeant Michaud testified that during the altercation, the young man dropped his cell phone and the magazine from his gun. According to Sergeant Michaud, "[t]he altercation then roll[ed] out the middle side door of

the bus, where they both [went] to the ground, and then the bus dr[ove] off." Sergeant Michaud clarified on cross-examination that the recording did not reveal any threats from the young man to Thomas; that Thomas struck the young man first; and that the footage did not provide officers with any reason to think that the young man had done anything to start an argument with Thomas.

Sergeant Michaud testified that officers also obtained additional surveillance footage of the surrounding area from several sources that captured the time period shortly after the altercation on the bus. Like the footage from the bus, these recordings were not played for the trial court or entered into evidence. According to Sergeant Michaud, one recording captured the "muzzle flash" of a gunshot, which illuminated "[v]ery faint silhouettes" of those involved. According to Sergeant Michaud, one of these videos showed the man "divert[ing] his direction" to avoid police, whose lights, Sergeant Michaud testified, were visible on the recording.

Sergeant Michaud further explained that Mickel had a mask[3] on at the time of this recording, but he did not have a mask when on the bus. Sergeant Michaud clarified on cross-examination, however, that there was no way to tell from the video why Mickel changed course and that any theories about his change of direction would be speculative.

Using a still image of the young man from the MARTA security footage provided by Sergeant Michaud, Detective Leary canvassed nearby businesses for further information. Detective Leary testified that on June 23, 2023, he contacted a local warehouse employee, who recognized the young man and stated that the man would be coming in later for his shift.[4]

Detective Leary testified that later that day he was in his patrol car with Officer Smith when they observed the young man from the MARTA footage walking on North Commerce Drive toward

---

[3] In the body-camera footage of Mickel's arrest, which is described further below, Mickel can be seen wearing a medical-style mask.

[4] Though the employee identified the young man from the photo as a co-worker, the employee apparently did not give the man's name.

the warehouse. They radioed for backup, and pulled their car adjacent to the man, who later identified himself as Mickel. They then got out of the car and approached him on foot with guns drawn and ordered him to get on the ground, where he was handcuffed.[5] Because neither Detective Leary nor Officer Smith was wearing a body camera, this portion of the encounter was not recorded.

According to Detective Leary, officers then stood Mickel up, patted him down, and searched his person. Detective Leary testified that shortly after the search, one responding officer said to another, "That's the guy," and Mickel interjected, "I shot him in self[-]defense." But on cross-examination, Detective Leary conceded that his police report documenting the encounter did not mention any statements made by Mickel.

According to Detective Leary, Officer Jenkins arrived in his

---

[5] Notwithstanding Detective Leary's testimony that he drew his gun and told Mickel to get on the ground, Detective Leary equivocated about whether Mickel was free to leave. On cross-examination Detective Leary initially testified that Mickel was not free to leave. But he later explained that he was "asking" rather than commanding Mickel to get on the ground, and that "[i]t would have been okay if he chose not to get on the ground." On redirect examination, Detective Leary changed his answer again and testified that Mickel "was not free to leave."

patrol car approximately 30 seconds to one minute after the call for backup went out. Unlike Detective Leary, Officer Jenkins wore a body camera, which recorded the events immediately after Mickel had been handcuffed. The video from Officer Jenkins's bodycam was entered into evidence, and the first two minutes and 14 seconds of the video were played for the court.

As the video begins, Mickel is standing, handcuffed, and being held up by Detective Leary and another officer. Mickel can be heard in the first second of the recording saying, "I didn't kill nobody, alright? I shot his a** 'cause he tried to take my gun for no reason." Because the video begins with Mickel's statement, it does not reveal what, if anything, prompted him to make it. Officers then led Mickel to Officer Jenkins's patrol car, where they removed his cell phone and other items from his pockets and placed him, still handcuffed, in the back seat. As explained above, officers can be heard telling Mickel that he was merely being detained and that he had not been charged with any crime.

Officers then transported Mickel to the police station, where

9

they took him to an interrogation room, read him his *Miranda* rights, and proceeded to question him for about an hour. According to Sergeant Michaud, officers obtained an arrest warrant for Mickel after the interview, pursuant to which they formally arrested him.

Sergeant Michaud testified on cross-examination that officers had the "reasonable suspicion" necessary to detain Mickel prior to confronting him, but they "had more questions to answer before definitively saying that [they were] going to charge this person for murder." Though, at the time of the encounter, officers had determined that the young man on the bus was an employee at the warehouse, Sergeant Michaud testified that they did not yet know his name, his date of birth, his criminal history, whether Mickel "was a victim himself," or whether a crime had even been committed. In Sergeant Michaud's view, he obtained the probable cause necessary for an arrest warrant from Mickel's statements during the interview.

Detective Leary initially testified that, in his view, officers had "probable cause to charge" Mickel at the time they detained him, but

he clarified under questioning from the judge that he meant there was "probable cause to *detain* him" and that they "detained him because [they were] building up more probable cause for the homicide detective[.]"

Mickel presented no evidence of his own at the evidentiary hearing, but as alluded to above, his counsel subjected the officers to cross-examination.

(b) Following the hearing, the trial court issued a series of two written orders. In its first order, dated August 19, 2024, the trial court found that "a layperson identified the defendant from still images" of the MARTA bus's surveillance footage; that officers "encountered the defendant walking down the street"; and that, upon encountering him, officers "restrained [Mickel] to a degree associated with a formal arrest." The trial court concluded that because officers restrained Mickel to this degree, probable cause was required "at the point the police encountered him walking down the street and took him into custody." The trial court noted Sergeant Michaud and Detective Leary's testimony about the absence of

11

probable cause and concluded, without further analysis, that officers lacked probable cause to arrest Mickel; that Mickel had therefore been "seized in violation of the Fourth Amendment"; and that his subsequent statements to law enforcement must accordingly be "suppressed as fruit of the poisonous tree of his illegal seizure."

The State filed a motion for reconsideration, arguing that the trial court's apparent reliance on Sergeant Michaud and Detective Leary's subjective beliefs about the absence of probable cause was improper. See, e.g., *State v. Reynolds*, 504 SW3d 283, 301 (III) (A) (4) (Tenn. 2016) ("Because the assessment of probable cause is reviewed from a purely objective perspective, the officer's subjective state of mind is irrelevant." (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (126 SCt 1943, 164 LE2d 650) (2006)).

On August 28, 2024, the trial court granted the State's motion for reconsideration, but it did so in an order that once again suppressed Mickel's statements, albeit using reasoning that expressly "[e]xclud[ed] the officers' subjective belief[s]" from its analysis. The trial court's second order, which did not vacate the

12

original order, added the following factual findings: (1) Thomas attacked Mickel on the bus; (2) Mickel "was armed" at the time Thomas attacked him; and (3) Thomas was "found dead a short time later." Though the trial court's factual findings were limited in this way, it did not expressly reject any of the officers' testimony, and it made no explicit findings about their credibility. As it had in its first order, the trial court concluded that these facts raised a "reasonable suspicion" sufficient to briefly detain Mickel but fell short of the probable cause necessary to arrest him, as officers had done. Following the court's second order, the State filed a notice of appeal challenging the probable cause determination on which the court based its suppression of Mickel's statements.

2. The State argues that Mickel's arrest was supported by probable cause and that the trial court therefore erred by suppressing Mickel's statements. As explained further below, the trial court's orders preclude us from determining whether this is so, and so we must vacate the court's ruling and remand for further proceedings.

(a) We have explained that "there are at least three types of police-citizen encounters: verbal communications that involve no coercion or detention; brief stops or seizures . . . ; and arrests[.]" *State v. Copeland*, 310 Ga. 345, 351 (2) (b) (850 SE2d 736) (2020) (citation and punctuation omitted). Though a brief stop or seizure requires only "a reasonable articulable suspicion that the citizen is committing or has committed a crime," an arrest "can be supported only by probable cause." Id. at 351-352 (2) (b) (citation and punctuation omitted). See also U. S. Const. Amend. IV.

Probable cause to arrest exists where there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Westbrook v. State*, 308 Ga. 92, 95 (2) (839 SE2d 620) (2020) (quoting *Michigan v. DeFillippo*, 443 U. S. 31, 37 (III) (99 SCt 2627, 61 LE2d 343) (1979)). "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide

14

whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Id. (quoting *District of Columbia v. Wesby*, 583 U. S. 48, 56-57 (III) (138 SCt 577, 199 LE2d 453) (2018)). Though probable cause is a "fluid concept" that is "not readily . . . reduced to a neat set of legal rules," id. (quoting *Wesby*, 583 U. S. at 57 (III)), we have explained that the "quantum of evidence" necessary to support a finding of probable cause is the "'fair probability' on which 'reasonable and prudent people, not legal technicians, act[.]'" *Caffee v. State*, 303 Ga. 557, 561 (2) (814 SE2d 386) (2018) (quoting *Florida v. Harris*, 586 U. S. 237, 243-244 (II) (133 SCt 1050, 185 LE2d 61) (2013)). "Because the standard for probable cause depends on what a reasonable officer could have concluded from those facts and circumstances, the standard of probable cause is an objective one, and the subjective thinking of the actual officers in a particular case is not important." *Hughes v. State*, 296 Ga. 744, 749 (2) (770 SE2d 636) (2015).

(b) When "reviewing a ruling on a motion to suppress, we review the trial court's factual findings for clear error and its legal

15

conclusions de novo." *Lumpkin v. State*, 310 Ga. 139, 150 (3) (849 SE2d 175) (2020). In doing so, we "construe the evidence most favorably to the upholding of the trial court's findings and judgment." *Douglas v. State*, 303 Ga. 178, 181 (2) (811 SE2d 337) (2018) (citation and punctuation omitted). But though "we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts." *Hughes*, 296 Ga. at 750 (2).

Here, the trial court's findings of fact with respect to probable cause were extremely limited: the court found only that a layperson identified Mickel as the young man in the MARTA surveillance footage; that Thomas attacked Mickel on the bus; that Mickel was armed at the time of the attack; and that Thomas was found dead a short time later.

The State contends that these facts, coupled with the surveillance footage — which it claims is "undisputed" — establish

probable cause, i.e., that the officers possessed information at the time of Mickel's arrest suggesting with at least a fair probability that Mickel "shot and killed Thomas." But this misstates the record. The State did not submit the surveillance footage from the MARTA bus or the surrounding businesses into evidence; instead, the trial court heard only the officers' testimony about such footage, which the trial court was not obligated to believe. See *Hughes*, 296 Ga. at 747 (1) ("The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony.").

Thus, we are left with only those limited facts found by the trial court. See *State v. Lopez-Cardona*, 319 Ga. 222, 223 (1) n.1 (903 SE2d 18) (2024) ("[A]ppellate courts generally must limit their consideration of the disputed facts to those expressly found by the trial court." (citation and punctuation omitted)). Based on these facts, the trial court concluded that the officers had only the reasonable suspicion necessary to detain Mickel, rather than the probable cause necessary to arrest him. But in applying the law to

the facts, the trial court did not explain which of its findings gave rise to the officers' reasonable suspicion and why those findings fell short of probable cause. Moreover, the court's limited findings leave open the possibility that its conclusion was determined in part by additional unstated findings of fact and credibility determinations. Other than the limited findings presented, we do not know what portions of Sergeant Michaud's testimony and Detective Leary's testimony the trial court credited to find that there were "specific and articulable facts that provide a reasonable suspicion that the individual being stopped is engaged in criminal activity," *Jones v. State*, 291 Ga. 35, 38 (2) (727 SE2d 456) (2012), and what portions of their testimony the trial court relied upon or discredited to determine that there were insufficient facts and circumstances "to warrant a prudent person, or one of reasonable caution, in believing in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense," *Westbrook*, 308 Ga. at 95 (2) (citation and punctuation omitted).

Though we have an obligation to "construe the evidentiary

record in the light most favorable to the factual findings and judgment of the trial court," we find ourselves unable to do so in this case because it is unclear how the trial court reached its conclusion from its limited findings and whether the trial court made any additional unstated findings of fact that would explain its decision. *Hughes*, 296 Ga. at 746 (1).

This uncertainty leaves us unable to provide meaningful appellate review. Accordingly, we vacate the portions of the trial court's August 19 and August 28, 2024 orders concluding that officers lacked probable cause to arrest Mickel and its associated ruling suppressing Mickel's statements. We remand to the trial court for additional fact-finding and analysis. See *Tatum v. State*, 319 Ga. 187, 196 (2) (b) (903 SE2d 109) (2024) ("If the trial court has made express findings of fact, but not with sufficient detail to permit meaningful appellate review, an appellate court may remand for further findings." (citation and punctuation omitted)); *Williams v. State*, 301 Ga. 60, 62 (799 SE2d 779) (2017) (same); *Hughes*, 296 Ga. at 746 (1) n.6 (same). Though we mandate no specific findings on

remand, we note that it would be particularly helpful to identify what, if any, of the officers' testimony the trial court found not to be credible, and whether and to what extent the trial court's probable cause analysis was affected by a finding that Mickel acted in self-defense.[6]

*Judgment vacated and case remanded. Peterson, C. J., Warren, P. J., and Bethel, Ellington, McMillian, LaGrua, and Pinson, JJ., concur.*

---

[6] The State argues that the possibility that Mickel acted in self-defense does not negate probable cause. Mickel agrees but argues that officers lacked probable cause to arrest him for killing Thomas in the first instance, apart from any theory of self-defense. Neither this Court nor the United States Supreme Court has squarely addressed whether self-defense negates probable cause, and we express no opinion about the matter here. See generally Ryan P. Sullivan, Revitalizing Fourth Amendment Protections: A True Totality of the Circumstances Test in § 1983 Probable Cause Determinations, 105 Iowa L. Rev. 687 (Jan. 2020) (noting conflicting caselaw across multiple jurisdictions and the absence of controlling Supreme Court precedent "on the probable cause-affirmative defense issue"). See also *Davis v. City of Apopka*, 78 F4th 1326, 1336-1338 (I) (B) (11th Cir. 2023) (reviewing circuit court precedent regarding self-defense and probable cause).

Decided June 10, 2025.

Probable cause; murder. Fulton Superior Court. Before Judge Ingram.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Assistant District Attorney*, for appellant.

*Lauren B. Shubow, Stephen R. Scarborough, Nathanael A. Horsley*, for appellee.